**UNITED STATES of America, Appellee,**

v.

**Victoria VAMOS, Defendant-Appellant.**

**No. 1314, Docket 85–1476.**

United States Court of Appeals,
Second Circuit.

Argued May 23, 1986.

Decided July 31, 1986.

Joel A. Brenner, East Northport, N.Y., for defendant-appellant.

Bruce A. Green, Asst. U.S. Atty., New York City (Rudolph W. Giuliani, U.S. Atty. S.D.N.Y., David S. Hammer, Asst. U.S. Atty., New York City, of counsel), for appellee.

Before MANSFIELD, OAKES and MESKILL, Circuit Judges.

MANSFIELD, Circuit Judge:

Defendant Victoria Vamos appeals from a judgment entered in the Southern District of New York after a jury trial before Judge Shirley W. Kram. The jury found Vamos guilty of 13 counts of aiding and abetting the distribution of controlled substances outside the scope of professional medical practice, 21 U.S.C. §§ 812 and 841, five counts of furnishing false information in records which the federal narcotics laws require to be maintained, 21 U.S.C. § 843, and one count of conspiracy to commit the foregoing offenses, 21 U.S.C. § 846. We affirm.

In the late 1970's and early 1980's Victoria Vamos was the nurse and office manager in the office of Dr. Leo Laszlo Sugar. During the period Dr. Sugar, a New York City physician in private practice, specialized in "bariatrics", or weight control. Dr. Sugar prescribed, and his staff dispensed, large quantities of controlled drugs, specifically, phendimetrazine and phentermine, stimulants which are used as diet pills. Dr. Sugar also provided controlled barbituate sleeping pills to his patients. These drugs are "Schedule III" substances, which have "currently accepted medical use[s] in treatment in the United States" but are susceptible to abuse which "may lead to moderate or low physical dependence or high psychological dependence". 21 U.S.C. § 812(b)(3). Dr. Sugar and his staff sold amounts of these drugs far in excess of medically acceptable dosages to virtually anyone who sought to make purchases.

Until 1978 Vamos, who served as Dr. Sugar's nurse and office manager and eventually became a registered nurse in

1982, dispensed the drugs to patients who returned to the office for additional pills subsequent to their first visit. As Dr. Sugar's practice grew, the task of dispensing pills was assigned to Gloria Reinhart, an assistant in the office. Reinhart testified that on the first few occasions when a patient visited Dr. Sugar's office, the approval of Dr. Sugar or Vamos was required before pills were sold. On subsequent visits, Reinhart was given carte blanche to sell as many pills as the patient desired.

In June 1981, investigators for the New York State Bureau of Controlled Substances visited the office to conduct a biennial "diversion audit", to determine whether the amount of controlled substances ordered by Dr. Sugar since 1979 matched the amount properly dispensed in the course of Dr. Sugar's practice. In conducting this audit the investigators discovered that the office maintained inadequate records concerning the dispensing of the controlled drugs. The records omitted such essential information as names of patients to whom the substances were sold, quantities of substances dispensed and the relevant dates. The investigators informed Dr. Sugar and Vamos that the records were deficient and that another audit would be conducted.

Following the departure of the investigators, Vamos directed the staff to create false records accounting for the drugs distributed between 1979 and 1981. Assuming that a proper dosage would be one vial of diet pills per week and that over the two years 104 vials could properly be dispensed to a single patient, Vamos calculated the number of patients necessary to make the quantity of drugs dispensed appear proper. Inevitably, the number of patients required for this purpose exceeded the number actually treated by Dr. Sugar. Vamos and the staff solved this problem by adding to the patients' records notations stating that pills had been dispensed to patients who had not received the controlled drugs. They also created records for friends and relatives who never in fact visited the office. The records stated that every patient, real or fictitious, visited the office every week of

the two-year period and received one vial of pills each visit. To complete the records, false medical information such as weights and blood pressures were added to each card. Lastly, the group "aged" the records by pouring dirt and stepping on them. During the period of these activities and continuing into 1983 Vamos continued to distribute controlled drugs to Dr. Sugar's patients as in the past.

The case was assigned to Judge Kram on September 20, 1984 and trial was scheduled to begin on April 16, 1985. On the afternoon of April 15, the court ordered a psychiatric examination of Dr. Sugar to determine his competency. Although neither the court nor counsel noted that Vamos' behavior was in any way unusual, Vamos expressed a desire to talk with a psychiatrist to discuss "personal stresses", and the court directed that an examination of her also be conducted that evening.

The next morning, Vamos' counsel told the court that "she is totally beyond reason" and unable to assist in the preparation of her defense. Dr. Steven Simring, who had examined both defendants the previous evening, then testified to having serious doubts about Dr. Sugar's competency to stand trial. With regard to Vamos, however, the psychiatrist concluded that she "has an excellent factual and rational understanding of the charges against her, has an excellent understanding of the legal proceedings, and ... is eminently capable of cooperating with counsel in the preparation of her defense". Simring also testified that Vamos made claims having "a delusional flavor" to the effect that police and the U.S. Attorney threatened her and her children with bodily harm and invasion of her home. He concluded that Vamos "may have some psychiatric difficulty which leads her to exaggerate anxiety and to perceive identities which are delusional" but that these problems did not affect her competency to stand trial. The court found Vamos competent to stand trial and denied counsel's application for a further psychiatric examination.

On April 16, following the colloquy concerning competency, Vamos entered a guilty plea which was accepted by the court. On June 26, represented by new counsel, Vamos moved to withdraw the plea on the grounds that it was coerced by her counsel at the time and, alternatively, that she was incompetent to plead guilty. Vamos' motion was supported by a psychiatric evaluation by Dr. Alvin Yapalater, which stated that she suffered from "paranoid psychosis with strong depressive features and suicidal tendencies". Although the psychiatrist concluded "she was not mentally competent" on the date the plea was entered, he did not draw any reasoned connection between his diagnosis and Vamos' ability to understand the nature of the proceedings or to confer with counsel. The government did not oppose the motion and Judge Kram vacated the plea without adopting either of the positions urged by Vamos.

A 16–day jury trial was held in September and October 1985. During the course of trial, the issue of competency was not raised by either counsel or the court. At trial Vamos offered two defenses. First, she contended that she was ignorant of the massive quantities of drugs that had been purveyed. To support this contention, she presented witnesses suggesting that two members of the staff, both of whom had testified for the government, actually dispensed the drugs clandestinely and pocketed the proceeds. Second, Vamos' counsel argued that Dr. Sugar served as a mentor and father-figure to her and, to the extent that she was aware of the occurrences in the office, she trusted Dr. Sugar's professional judgment that the treatments were medically proper.

Vamos was convicted on 19 of 30 counts. Vamos' counsel submitted a sentencing memorandum which included a report by Dr. Robert Goldstein, a psychiatrist who examined Vamos on November 30, 1985. Dr. Goldstein concluded Vamos suffered from "a serious psychiatric disorder, viz MAJOR DEPRESSION." Although he indicated "incarceration would be devastating and destructive for Ms. Vamos and her

children", his report did not touch on the issue of competency to stand trial. The court setenced Vamos to a term of one year's incarceration, six months of which was suspended, and a five-year probationary period.

## DISCUSSION

### Competency

■ "It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." *Drope v. Missouri,* 420 U.S. 162, 171, 95 S.Ct. 896, 903, 43 L.Ed.2d 103 (1975). Accordingly, 18 U.S.C. § 4241 provides that at any time prior to sentencing the district court upon its own motion, or that of the defense or prosecution, shall order a hearing to determine the mental competency of the accused "if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." Determination of whether there is "reasonable cause" to believe a defendant may be incompetent rests in the discretion of the district court. *United States v. Oliver,* 626 F.2d 254, 258 (2d Cir.1980); *Newfield v. United States,* 565 F.2d 203, 206 (2d Cir. 1977).

■ Vamos contends that the district court abused its discretion by not ordering a competency hearing in compliance with the procedural requirements of 18 U.S.C. § 4247(d). She maintains that the conclusions of Dr. Yapalater and Dr. Goldstein obligated the court to undertake further inquiry of her competence.

The question of competency to stand trial is limited to the defendant's abilities at the time of trial, *United States v. Makris,* 483 F.2d 1082, 1091 (5th Cir.1973), *cert. denied,* 415 U.S. 914, 94 S.Ct. 1408, 39 L.Ed.2d 467 (1974), and failure to conduct a full competency hearing is not a ground for reversal when the defendant appears competent during trial. *United States v. Dunn,* 594 F.2d 1367, 1372 (10th Cir.), *cert. denied,* 444 U.S. 852, 100 S.Ct. 106, 62 L.Ed.2d 69 (1979). Accordingly, deference is owed to the district court's determinations based on observation of the defendant during the proceedings. *See Oliver, supra,* 626 F.2d at 258–59; *United States v. Vowteras,* 500 F.2d 1210, 1212 (2d Cir.), *cert. denied,* 419 U.S. 1069, 95 S.Ct. 656, 42 L.Ed.2d 665 (1974). During the course of the 16–day trial the court did not observe any unusual behavior by the defendant in the courtroom which would provide a basis for doubting Vamos' competence.

Additionally, since incompetency involves an inability to assist in the preparation of a defense or rationally to comprehend the nature of the proceedings, failure by trial counsel to indicate the presence of such difficulties provides substantial evidence of the defendant's competence. Here counsel neither moved for a competency hearing pursuant to § 4241 nor indicated to the court at the time of trial any grounds for doubting the defendant's competence. Indeed, Vamos' ability to assist in her own defense was apparent. For instance, a witness called by the defense testified that Vamos communicated with her and asked her to appear in court on Vamos' behalf. This evidence of competence dispelled any doubt created by the report of Dr. Yapalater, which was based on a single interview approximately four months before trial.

The report of Dr. Goldstein submitted to the court as part of defendant's sentencing memorandum indicated that Vamos was suffering from depression but did not address issues bearing on ability to confer with counsel and to assist in the preparation of a defense. Dr. Goldstein offered no opinion as to Vamos' competence. It is well-established that some degree of mental illness cannot be equated with incompetence to stand trial. *Hall v. United States,* 410 F.2d 653, 658 (4th Cir.), *cert. denied,* 396 U.S. 970, 90 S.Ct. 455, 24

L.Ed.2d 436 (1969). Since Dr. Goldstein's report did not link Vamos' illness to her competency to stand trial, and the observations of the court and Vamos' counsel did not provide such a connection, the report did not give rise to reasonable cause to doubt Vamos' competency to do so.

Because Vamos' conduct did not provide a reasonable basis for doubting her competence to stand trial and, to the contrary, indicated that she was an active participant in preparing her case, we reject the contentions that the district court abused its discretion in considering Vamos competent to stand trial or that the court was compelled to conduct a full inquiry into Vamos' competence. *Zovluck v. United States,* 448 F.2d 339 (2d Cir.1971).

*Jury Instruction*

Before examining the language of the district court's instruction challenged by Vamos a brief review of governing principles is essential. The Controlled Substance Act, 21 U.S.C. §§ 801, *et seq.* ("CSA") states that "except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally ... to distribute, or dispense a controlled substance". 21 U.S.C. § 841(a)(1). Absent an exemption or qualification, this law would make it a crime for a doctor or nurse in the course of their professional practice to distribute or dispense a controlled substance to a patient unless it were "done because of mistake, or accident or other innocent reason." *United States v. Marvin,* 687 F.2d 1221, 1227 (8th Cir.1982), *cert. denied,* 460 U.S. 1081, 103 S.Ct. 1768, 76 L.Ed.2d 342 (1983). There is no evidence in the present case that Vamos did not act "knowingly and intentionally" in distributing controlled drugs to various persons; indeed, the trial court instructed the jury that the government was required to prove "that defendant knew what she was doing and that she was not acting out of mistake or carelessness".

In order to enable physicians and certain others (e.g., manufacturers) lawfully to distribute or dispense drugs within the course of their professional practice Congress provided that "Persons registered ... under this subchapter ... are authorized [to dispense controlled substances] ... to the extent authorized by their registration and in conformity with the other provisions of this subchapter." 21 U.S.C. § 822(b). Such registration is mandatory if the registrant is authorized to dispense drugs under the law of the state where he or she practices. The Attorney General, acting under authority granted by the CSA, 21 U.S.C. § 821, promulgated regulations providing that controlled drugs may be prescribed "for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice". 21 C.F.R. § 1306.04 (1986). The term "practitioner" is defined by the CSA as a "physician, ... hospital or other person licensed, registered, or otherwise permitted, by the United States or the jurisdiction in which he practices ... to distribute, dispense ... a controlled substance in the course of professional practice". 21 U.S.C. § 802(21). The term "professional practice" refers to generally accepted medical practice; a practitioner is not free deliberately to disregard prevailing standards of treatment. *United States v. Norris,* 780 F.2d 1207, 1209 (5th Cir.1986). In short, the doctor must act in the good faith belief that his distribution of the controlled substance is for a legitimate medical purpose and in accordance with the usual course of generally accepted medical practice. In *United States v. Moore,* 423 U.S. 122, 138–39, 96 S.Ct. 335, 343–44, 46 L.Ed.2d 333 (1975), the Court quoted and implicitly approved a jury instruction explaining that a physician could be convicted if the jury found that he knowingly distributed controlled drugs "other than in good faith for detoxification in the usual course of a professional practice and in accordance with a standard of medical practice generally recognized and accepted in the United States." *Id.* at 138–39, 96 S.Ct. at 343–44.

Thus the CSA establishes an enforcement scheme to regulate the legitimate distribution of controlled substances and to halt illegal distribution. H.R.Rep. 91–1444,

**1152**

91st Cong., 2d Sess., *reprinted in* 1970 U.S. Code Cong. & Ad. News 4566, 4567. Various provisions of the Act are designed to control procedures to be followed in legitimate distribution, *see, e.g.,* §§ 821–830, and a medical practitioner's lack of compliance with these provisions may be punishable criminally, 21 U.S.C. §§ 842, 843.[1] Section 841(a), however, is clearly directed at halting distribution outside the scope of a legitimate chain of possession. *United States v. Moore, supra,* 423 U.S. at 130, 96 S.Ct. at 339. The *Moore* Court held that a physician has no special license to divert the flow of drugs from legitimate medical distribution, to illicit commercial trade and that if he does so he may be prosecuted under § 841(a) since he then acts as a "drug pusher" rather than as a medical professional. *Moore, supra,* 423 U.S. at 138, 96 S.Ct. at 343.

■■■ The issue raised by Vamos with respect to the district court's jury charge in the present case is the standard by which the belief of a person claiming to have distributed controlled drugs for legitimate medical uses is to be governed. The court instructed the jury:

"The final element the government must prove beyond a reasonable doubt is that the defendant dispensed the drugs, or caused them to be dispensed, other than for a legitimate medical purpose and not in the course of medical practice. . . .

\*     \*     \*     \*     \*     \*

"Furthermore, if a doctor dispenses drugs in good faith in medically treating a patient, then the doctor has dispensed the drug for a legitimate medical purpose in the usual course of medical practice; that is, he has dispensed the drug lawfully.

"Good faith in this context means good intentions and the honest exercise of best professional judgment as to a patient's needs. It means that the doctor acted in accord with what he *reasonably* believed to be proper medical practice.

"Therefore, if you find the defendant *reasonably* relied on the doctor's good faith in dispensing the controlled substances, you must find her not guilty. This is true, moreover even if you find that the doctor was not, in fact, dispensing pills for proper medical purposes, *as long as her reliance on his good faith was reasonable under the circumstances.*

"If you find, however, that the doctor was behaving in bad faith, and that the defendant, *knew or reasonably should have known* this, you must find her guilty of the crime charge." (Emphasis supplied).

Vamos argues that if the jury found that she relied on Dr. Sugar's good faith, she was entitled to a finding of not guilty, whether or not her reliance was "reasonable".[2] We disagree.

The exemption granted to medical practitioners engaged in distribution of controlled substances is a limited one. Because they have been licensed as practitioners and registered under the CSA, they enjoy a privilege not extended to the layman. That privilege, based on the assumption that practitioners, by reason of their

---

1. Accordingly, § 841(a) carries heavier penalties than either §§ 842 or 843, which punish "more or less technical violations". H.R.Rep. No. 1444, U.S. Code Cong. & Ad. News at 4576. *See United States v. Green,* 511 F.2d 1062, 1067 (7th Cir.), *cert. denied,* 423 U.S. 1031, 96 S.Ct. 562, 46 L.Ed.2d 405 (1975).

2. The government contends that Vamos failed to raise this objection sufficiently below. The record, however, reveals that in reviewing the court's proposed charge Vamos' counsel stated "I would oppose the 'reasonable' language [Assistant U.S. Attorney] Hammer added" and requested that the phrase containing the word "reasonable" be stricken. The prosecutor acknowledged at the time that counsel "disagrees with the term reasonable". When counsel raised the point again after the charge was given to the jury, the court stated that it had ruled on the issue. Although these objections are far from ideal, we find them sufficient to meet the standard of Fed.R.Crim.P. 30. The specificity of counsel's objection combined with indications from both the prosecutor and the court that they understood the claim, reveal that the grounds of the objection were apparent to all involved.

expertise and training, will be guided by generally accepted professional practice, carries with it greater responsibilities than those chargeable to the unlicensed person. These added responsibilities are essential to protect the public against abuse by "registrants, who have the greatest access to controlled substances and therefore the greatest opportunity for diversion", *Moore, supra,* 423 U.S. at 135, 96 S.Ct. at 342.[3]

In view of the special responsibilities assumed by a practitioner registered under the CSA we believe that, although not mandated, an instruction that the jury should use an objective standard of reasonableness in deciding whether a practitioner acted in accord with what he believed to be proper medical practice is not improper and does not amount to error. Indeed it is difficult to conceive of a situation, in such a carefully regulated field, in which a registered practitioner would have an "unreasonable" good faith belief that his distribution was for a legitimate medical purpose and in accord with the usual course of generally accepted medical practice. The suggestion that an objective reasonableness standard exposes a physician to criminal responsibility for nothing more than the equivalent of malpractice ignores the fact that in a criminal prosecution the physician may be found guilty only upon proof beyond a reasonable doubt that he acted outside the scope of medical practice, as distinguished from the lesser burden assumed in a civil malpractice suit.

To permit a practitioner to substitute his or her views of what is good medical practice for standards generally recognized and accepted in the United States would be to weaken the enforcement of our drug laws in a critical area. As the Supreme Court noted in *Moore,* "Congress intended the CSA to strengthen rather than to weaken the prior drug laws". 423 U.S. at 139, 96 S.Ct. at 343. Faced with a situation similar to that presented here, the Fifth Circuit approved an objective standard for determining what constitutes accepted medical practice, stating, "[o]ne person's treatment methods do not alone constitute a medical practice." *United States v. Norris, supra,* 780 F.2d at 1209. The Sixth Circuit has likewise followed an objective "reasonableness" standard, approving an instruction to the effect that a physician's good faith dispensation of a controlled substance in the usual course of his professional practice "connotes an observance of conduct in accordance with what the physician should reasonably believe to be proper medical practice." *United States v. Voorhies,* 663 F.2d 30, 33–34 (6th Cir.1981).

There remains the question of whether Vamos, who was charged as a co-conspirator, unlawful distributor, and aider and abettor of Dr. Sugar's unlawful conduct, 18 U.S.C. § 2, should be judged by a subjective rather than a reasonableness standard on the ground that she was not the physician-registrant and she may have relied in good faith on Dr. Sugar, whom she regarded as her father-figure and mentor as the result of their close relationship over the years. While those who assist practitioners in distributing controlled drugs clearly cannot be held to the standard of a reasonable practitioner, they are not free to unreasonably rely on the judgment of their employers. Such staff members may only distribute controlled drugs by virtue of the same limited privilege that shields the practitioners whom they assist. The jury in this case was entitled to weigh the fact that a trained nurse such as Vamos is expected to have a higher degree of awareness than the average layman, yet a lower degree of knowledge than a licensed physician. In short, we fail to find anything unfair, improper or prejudicial about application of an objective standard to her conduct as a nurse and office manager. There was ample evidence from which the jury

---

**3.** In *Moore* the defendant admitted that at the time he prescribed controlled drugs he knew he was deviating from generally accepted medical principles. His defense was that he was employing an experimental treatment program. 423 U.S. at 126, 96 S.Ct. at 338. As a result, the jury charge stressed that a physician cannot deliberately ignore generally accepted principles of medical practice.

could infer beyond a reasonable doubt that she could not reasonably fail to know that Dr. Sugar was engaged in unlawful activity and that she intended to help him do so, which is the test. *See United States v. McDaniel*, 545 F.2d 642, 644 (9th Cir.1976).

Vamos' further contention that the district court erred in not charging the jury that she could be found guilty of furnishing false and fraudulent material in records required to be made and kept under federal narcotics laws, 21 U.S.C. § 843, 18 U.S.C. § 2, only upon proof that she knew of the federal registration and record-keeping requirements needs little discussion. Judge Kram did inform the jury that physicians were required to maintain records of controlled substances sold to patients and that Vamos was charged with falsifying such records. The instructions, when read as a whole, as they must be, *United States v. Whitten*, 706 F.2d 1000, 1019 (9th Cir.1983), *cert. denied*, 465 U.S. 1100, 104 S.Ct. 1593, 80 L.Ed.2d 125 (1984), clearly convey the message that Vamos could only be found guilty if she knew that accurate patients' records were required by law to be kept.[4] But even if the court failed to so state in plain language, the error would be harmless beyond a reasonable doubt in view of the overwhelming evidence of Vamos' guilt of these charges. This evidence included testimony by members of Dr. Sugar's staff of Vamos' decision to create a false record system after Investigator Siegel of the New York State Bureau of Narcotics Control advised her of the inadequacy of the office's records. Staff members testified about Vamos' central role in the fabrication of several hundred patients' dispensing cards containing false statements as to weights, blood pressures, visits, amounts of drugs dispensed and her assignment of Nador Retek to the job of "aging" these records by pouring dirt on them and stamping them with his feet.

We have reviewed Vamos' other claims of error and find them to be without merit. The trial judge acted well within her discretion in admitting the testimony of medical experts. Fed.R.Evid. 702. The statements of co-conspirators challenged as hearsay were properly admitted as statements in furtherance of the conspiracy, the existence of which was established by a fair preponderance of the evidence. *United States v. Paone*, 782 F.2d 386, 390–91 (2d Cir.1986). Vamos' contention that imposition of any prison sentence in this case would constitute cruel and unusual punishment is plainly frivolous.

The conviction is affirmed.

---

4. Judge Kram, for instance, emphasized to the jury that the government was required to prove that Vamos acted "knowingly or intentionally" in falsifying the records and that she "knew what she was doing, and was not acting out of mistake or carelessness".