**UNITED STATES of America,**

v.

**Vincent GIGANTE, Defendant.**

**Nos. CR 93–368, CR 90–446.**

United States District Court,
E.D. New York.

Aug. 28, 1996.

Zachary W. Carter, United States Attorney (Andrew Weissmann, George Stamboulidis, Assistant United States Attorneys, of counsel), Brooklyn, NY, for U.S.

LaRossa, Mitchell & Ross (James LaRossa, of counsel), New York, NY, for defendant.

## MEMORANDUM AND ORDER

NICKERSON, District Judge:

Defendant Vincent Gigante and others are charged in an indictment dated May 30, 1990 with committing crimes of labor payoffs, extortions, and mail frauds. A second indictment dated June 10, 1993 alleges that Gigante and others murdered six persons between July 10, 1980 and March 15, 1982, engaged in conspiracies to murder three other persons between June 1982 and 1991, and committed further crimes of labor payoffs and extortion.

Gigante's attorneys moved pursuant to 18 U.S.C. § 4241 for a hearing to determine his mental and physical competency to stand trial.

I

On June 13, 1990, Judge Raymond J. Dearie ordered psychiatric examinations of Gigante pursuant to 18 U.S.C. § 4241(b). On June 20, 1990 he appointed two psychiatrists, Dr. Jonas R. Rappeport and Dr. Daniel W. Schwartz, to conduct psychiatric examinations and report. Thereafter, Gigante was examined by those two doctors and by Dr. Abraham L. Halpern and Dr. Stanley Portnow, two psychiatrists selected by his attorneys.

After examining Gigante and reviewing his medical records, all four psychiatrists made reports and testified that Gigante was not competent to stand trial because he was unable to understand the proceedings against him or to assist in his defense.

In reaching this conclusion, the psychiatrists took into account Gigante's behavior and demeanor during their sessions with him and also the hospital reports made from 1969 on by Gigante's treating psychiatrists. In *United States v. Gigante*, 925 F.Supp. 967

(E.D.N.Y.1996) ("*Gigante I*"), familiarity with which is assumed, the court set forth the substance of these reports and of the doctors' accounts of their meetings with Gigante.

The examining doctors' diagnoses of incompetence were qualified. All four testified that new information could lead them to change their opinions. Before the hearings both Dr. Schwartz and Dr. Rappeport were asked whether their opinions would change if they were presented with clear and convincing evidence that Gigante had either (1) actively conducted the affairs of the Genovese Family during the time he says he was mentally ill, or (2) planned well in advance of their diagnoses a feigned insanity defense. Dr. Rappeport wrote on March 10, 1991 that such evidence might change his opinion. Dr. Schwartz wrote on March 8, 1991 that such evidence would lead him to conclude that Gigante was malingering and was fit to proceed.

After the psychiatrists testified the court heard testimony from former high ranking Members of organized crime and other witnesses. They gave evidence of Gigante's criminal activities during the years from the 1970s through 1991, evidence that had never been presented to the four examining doctors.

In *Gigante I* the court made various findings of fact (the "Findings") based on the evidence presented by these witnesses. The court found that Gigante "occupied high positions in the Genovese Family from at least the early 1970s until September of 1991 and as such performed executive functions." For example, Gigante took an active part in high level meetings and managed the internal organization and external affairs of the Genovese Family. The court also found that during this period Gigante took extreme measures—including a "crazy act" in which he feigned insanity—to conceal his illegal activities.

The court submitted the Findings to the four psychiatrists, directed them to accept them as true, and asked each to testify as to what extent, if any, the Findings altered their prior assessment of Gigante's competency to stand trial.

On May 28, 1996, Dr. Rappeport testified that the Findings "make me think that it is quite possible that [Gigante] is competent to stand trial and that much or all of his mental illness has been malingered." During cross-examination by Gigante's attorney, Dr. Rappeport also said that it is his opinion "to a medical degree of certainty" that Gigante is malingering.

On July 10, 1996, Dr. Schwartz testified that the Findings "convince me that [Gigante] is fit to proceed."

Dr. Halpern testified on May 28, 1996 and July 10, 1996. On May 28, 1996, he stated that the Findings had not changed his opinion that Gigante was incompetent to stand trial. On July 10, 1996, Dr. Halpern reiterated his opinion that Gigante is "incompetent to stand trial." At this time, Dr. Halpern also stated that he could not accept the finding that Gigante was competent and malingering in 1991. He felt that accepting this finding would require him to accept that Gigante is presently competent and malingering, a point that he was unwilling to concede.

On August 22, 1996, Dr. Portnow testified that after reading and accepting the Findings he concluded that in 1991 Gigante "was competent to stand trial." Dr. Portnow said that he believes to a reasonable degree of medical certainty that Gigante has been incompetent to stand trial since 1995. Before reading the findings, Dr. Portnow had attributed Gigante's incompetency to the combined effects of schizo-affective disorder and organic brain disease, but he now believes that Gigante suffers only from organic brain disease, which he said has become more serious since 1995.

Dr. Portnow said that he examined Gigante at his home on April 16, 1996 and at Saint Vincent's Hospital in Westchester (the "Hospital") on August 4 and 6, 1996. During these examinations, Gigante displayed impaired cognition and short-term memory, fabricated stories to hide gaps in his memory, fixated on and repeated certain words, and behaved in a "childlike" manner. Dr. Portnow said that Gigante previously had displayed these symptoms, but that on these

three occasions the symptoms appeared generally "much more prominent." It was unclear to the court just how someone incapable of functioning in any area of life, as Dr. Portnow and others had previously described Gigante's condition over the years, could have deteriorated still further.

Two cardiologists, Dr. Bernard M. Wechsler and Dr. Francis M. Weld, testified about Gigante's physical competency to stand trial. Dr. Wechsler first examined Gigante in 1980 and has been his treating cardiologist since 1986. Dr. Weld has examined Gigante on several occasions beginning on September 19, 1990 and has reviewed the medical records. Dr. Wechsler and Dr. Weld testified before Judge Dearie on October 15 and 17, 1990 and before this court on January 30, 1995. Both doctors also submitted written reports describing Gigante's medical history and present physical condition.

## II

■ A criminal defendant is mentally competent to stand trial if he has (1) "a sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and (2) "a rational as well as a factual understanding of the proceedings against him." *United States v. Nichols,* 56 F.3d 403, 410 (2d Cir.1995) (quoting *Dusky v. United States,* 362 U.S. 402, 403, 80 S.Ct. 788, 789, 4 L.Ed.2d 824 (1960)). The Court of Appeals for the Second Circuit has stated that "some degree of mental illness cannot be equated with incompetence to stand trial." *United States v. Vamos,* 797 F.2d 1146, 1150 (2d Cir.1986), *cert. denied,* 479 U.S. 1036, 107 S.Ct. 888, 93 L.Ed.2d 841 (1987).

Under 18 U.S.C. § 4241(d), the court determines competency by a preponderance of the evidence. Although that section does not in terms allocate the burden of proof, the Supreme Court in referring to it has stated in dicta that "the accused in a federal prosecution must prove incompetence by a preponderance of the evidence." *Cooper v. Oklahoma,* 517 U.S. 348, ——, 116 S.Ct. 1373, 1380, 134 L.Ed.2d 498 (1996).

One judge in this district has also taken this position when the accused claims incompetency. *See United States v. Mason,* 88 CR 496 (E.D.N.Y. Jan. 7, 1994) (Korman, J.). The Court of Appeals has not yet decided the issue. *See Nichols,* 56 F.3d at 410. In any event "the allocation of the burden of proof to the defendant will affect competency determinations only in a narrow class of cases where the evidence is in equipoise; that is, where the evidence that a defendant is competent is just as strong as the evidence that he is incompetent." *Medina v. California,* 505 U.S. 437, 449–50, 112 S.Ct. 2572, 2580–81, 120 L.Ed.2d 353 (1992).

In determining Gigante's mental competency to stand trial, the court considers "a number of factors, including medical opinion." *Nichols,* 56 F.3d at 411.

### Medical Opinion

■ After reading the Findings, Dr. Schwartz testified unequivocally that Gigante is "fit to proceed." Dr. Rappeport testified that he believed that Gigante is malingering and that it is "quite possible" that he is competent to stand trial.

Although Dr. Halpern did not change his original diagnosis of incompetency, the court found his testimony unconvincing. Dr. Halpern made clear during direct and cross-examination that he was unable or unwilling to accept the court's instruction that he was to accept the Findings as true.

The court also does not credit Dr. Portnow's testimony that Gigante is presently incompetent to stand trial. In discussing the factors that led him to conclude that Gigante's condition has deteriorated since 1991, and particularly precipitously since 1995, Dr. Portnow described symptoms substantially identical to those displayed by Gigante since 1970.

Although Dr. Portnow said that the symptoms were more pronounced, other examining psychiatrists agreed that Gigante showed no signs of deterioration. Dr. Halpern testified on May 28, 1996 that he had examined Gigante on the previous evening and found him "essentially the same as he had been on previous occasions." On May 28, 1996, Dr. Rappeport testified that he examined Gigante in 1991 and 1995 and found "no great progression or remission of the symptomatic

picture between" those years. Dr. Rappeport also said that Gigante's medical records suggested that since the early 1970s his "symptomatic picture perhaps changed a little, but very little."

Dr. Portnow also emphasized that a SPEC Scan of Gigante's brain and various psychological tests suggested organic brain disease. But Dr. Rappeport did not believe that these results required him to find Gigante incompetent. Indeed, he conceded that Gigante had an "abnormal" SPEC scan, but said his brain damage was not "severe" or "extreme" and "would not say that the brain damage would account for any incompetency."

Based on the foregoing, the court finds the weight of medical opinion to show that Gigante is mentally competent to stand trial.

### Gigante's Persistent Malingering

The court described in the Findings Gigante's extensive efforts through September of 1991 to hide his criminal activities and to evade prosecution by presenting himself as crazy. The record reveals that in addition to these measures Gigante also sought over the years to mislead his doctors by inventing a false medical history and by concealing from them the true nature of his daily existence.

On April 17, 1959, Judge Bicks of the United States District Court for the Southern District of New York sentenced Gigante to seven years imprisonment for conspiracy to violate the narcotics laws of the United States. The record shows that before Gigante was released from prison in 1964, he never mentioned any history of mental or psychiatric illness.

On March 3, 1960, Gigante stated in a detailed "Report of Medical History" that he had never suffered from "depression or excessive worry," "loss of memory or amnesia," or "frequent or terrifying nightmares." He also said that he had never been a patient in a mental hospital or sanatorium and that he had been rejected for military service in 1952 because of a "bad heart."

On March 6, 1960, Gigante's mother, Yolanda Gigante, filled out a form providing information about his family, childhood, and education. She described Gigante as a "nor-mal," "healthy," and "happy" child. She mentioned a speech impediment and heart murmur, but did not refer to any childhood depression or phobias. She did not say that he had ever been knocked out or suffered severe head injuries as a boxer, or that he had been injured in a car accident.

A classification study dated March 24, 1960 discusses Gigante's childhood, but does not mention depression, phobias, or other psychological problems. This study includes a physical examination and correlated history prepared by Dr. Leon A. Witkin and dated March 15, 1960. The section of this report entitled "Past Medical History" does not allude to any psychiatric problems.

During his incarceration, in the years 1960–1964, Gigante complained of many physical ailments and received regular medical treatment, but never mentioned psychiatric problems or displayed any symptoms of them. The many pages of the prison physicians' reports on Gigante contain no mention of mental illness.

The accounts of Gigante's supervisors in prison do not suggest that he was under any mental disability. On June 23, 1961, E.F. McConnell, Gigante's supervisor at the prison power station, wrote a glowing recommendation for meritorious good time. He described Gigante as a "very good maintenance man" who "can be depended on to complete assigned duties without supervision and to the best of his ability." McConnell said that Gigante tried to learn the jobs of other inmates so that he could fill in for them.

On May 29, 1963 M. Musky, the operating engineer of the prison power plant, wrote that Gigante volunteered for difficult and dangerous jobs, including emergency work on top of a boiler. This work exposed him to extreme heat and took place without safety equipment at a height of thirty-five feet. Musky also said that Gigante frequently performed tasks beyond those expected of an inmate.

A Special Progress Report prepared by the Bureau of Prisons and dated February 7, 1964 mentions Gigante's "very good" job performance, his "neat and orderly" personal habits, and his status as a "well known leader

of the young, more aggressive Italian American inmates." It also describes Gigante's medical and psychiatric history, noting an I.Q. of 101, a history of pneumatic heart diseases, and abdominal complaints of various sorts. It mentions no psychiatric problems and closes with the observation that "the medical staff found no special abnormalities and it is considered that he is experiencing good health at the present time."

In short, the record shows that Gigante had never displayed any symptoms of mental illness before his release from Lewisburg Penitentiary in 1964. Up to that time, the medical histories provided by Gigante and his family did not mention any psychiatric problems.

The record shows that in 1969 Gigante was indicted in New Jersey Superior Court, Bergen County, on charges of bribery and conspiracy to obstruct justice. The indictment alleged that beginning in 1967 Gigante attempted to bribe members of the New Jersey police force to provide him with information about ongoing investigations and surveillances of him. The record also reveals that Gigante sought psychiatric treatment from Dr. Michael Scolaro in October of 1966, at about the time that he learned of the police investigation.

In 1970 and 1971 Judge Morris Malech of the New Jersey Superior Court, Bergen County, conducted hearings to determine Gigante's competency to stand trial on the bribery charges. Dr. Henry Davidson, Dr. Joseph Zigarelli, and Dr. George Cassidy examined Gigante in connection with this proceeding.

The record shows that Gigante displayed the same symptoms described in the Findings and that he and his family gave Dr. Scolaro and the examining psychiatrists a revised account of his childhood and medical history. Gigante's wife and mother reported that as a child he suffered from "severe temper tantrums, phobia for the dark, truancy at school, obesity, and learning problems" and that at the age of sixteen he was deferred from the army for "psychiatric causes."

Dr. Scolaro was told that Gigante had suffered "psychiatric disturbances since childhood." Dr. Scolaro and Dr. Davidson were both told that Gigante "had been under psychiatric care in childhood" and that these psychiatric issues had figured in his deferral from the military.

Medical reports also show that Gigante and his family concealed from his physicians the true nature of his day-to-day existence. All of Gigante's physicians were aware of his wife and five children living in New Jersey, but apparently none heard of his relationship with Olympia Esposito or the children that it produced.

On the basis of Gigante's behavior and the medical history that he and his family then described, the examining psychiatrists reported in 1971 that Gigante was incompetent to stand trial. On June 11, 1971, Judge Malech found Gigante incompetent because the doctors deemed him "insane" and there were "no other factual proofs presented by other witnesses" so he "could come to no other conclusion."

The record shows that after this competency hearing Gigante and his family continued to misrepresent to his doctors the nature of his life and the extent of his activities. In a letter dated January 4, 1973 to Queens County District Attorney Lombardino, Gigante's treating psychiatrist, Dr. Hugh McHugh, described him as leading a "very narrow existence" with "his entire world being confined to the block where he lives and the church he attends regularly with his mother." Dr. McHugh's 1977 admission note also refers to Gigante's "narrow life in Greenwich Village." In a discharge note dated March 24, 1982, Dr. McHugh referred to Gigante's "narrow sphere of living at home, going to church and going to a small cafe across the street and play [sic] pinball which was his life."

A social work record dated May 7, 1984 shows that Gigante and his family informed the hospital staff that Gigante "functions marginally at home and is cared for by his family."

As the scrutiny of Gigante's condition has increased over the years, he and his family have continued to revise his medical history

by adding previously undisclosed incidents of brain trauma. In 1971, Gigante's mother told Dr. Davidson that although he had been a boxer during adolescence, he had never been knocked out. At the same time, Dr. Scolaro said "there never had been any evidence of his having been punch drunk." But in 1991 Gigante's family told Dr. Portnow and Dr. Rolland S. Parker that during his boxing career he suffered numerous injuries to the head and face, including two severe head butts that caused hemorrhaging and swelling. Gigante's family also mentioned, apparently for the first time, that during his childhood he was struck by cars on two occasions. In one of these accidents, when Gigante was eight years old, he was allegedly knocked unconscious.

The behavior described in the Findings and Gigante's dealings with his doctors convince the court that Gigante deliberately feigned mental illness from the late 1960s until at least September of 1991. As he has presented no convincing reason for the court to conclude otherwise, the court finds that the symptoms that Gigante has demonstrated since that time are also the product of his malingering.

Gigante's attorneys say that even if he was competent to stand trial in September 1991, his condition has so deteriorated that he can no longer understand the proceedings or assist in his own defense. In support of this argument, they offer the testimony of Gigante's dentist, Dr. Rubin, and his chiropractor, Dr. Pressman, who said that they observed a steady deterioration in Gigante's condition.

Without objective medical evidence that Gigante suffered some new illness after 1991, the court can only conclude that the symptoms of deterioration observed by Dr. Portnow, Dr. Rubin, and Dr. Pressman are the result of malingering. As Gigante has feigned illness for over twenty years, the reasonable inference from the appearance of any exaggerated symptoms after 1991 is not that his condition has deteriorated, but rather that the imminent threat of prosecution has increased his incentive to malinger.

### III

Although 18 U.S.C. § 4241 provides a basis for hearings to determine only mental competency, the court may entertain a motion for a continuance or severance on the ground that the accused is physically incompetent to stand trial. *See United States v. Jones,* 876 F.Supp. 395, 397 (N.D.N.Y.1995). The court may not dismiss an indictment because of physical incompetency, *see id.* at 396 n. 1, and will grant a continuance only if the impending trial poses a "substantial danger" to Gigante's life or health, *United States v. Brown,* 821 F.2d 986, 988 (4th Cir.1987).

In determining whether Gigante is physically competent to stand trial, the court considers: (1) medical evidence; (2) his activities "outside the courthouse;" (3) the availability of measures to minimize the risks to his health; (4) the character of the impairment and its expected duration; and (5) the "magnitude or seriousness of the case." *United States v. Gambino,* 809 F.Supp. 1061, 1077 (S.D.N.Y.1992) (citing *United States v. Doran,* 328 F.Supp. 1261, 1263 (S.D.N.Y. 1971) (Frankel, J.)).

### Medical Evidence

Gigante, now sixty-eight years old, has been hospitalized complaining of various coronary ailments on several occasions since 1980. In 1988 he underwent surgery to replace a dysfunctional aortic valve with a healthy porcine valve. Dr. Wechsler and Dr. Weld agree that Gigante now suffers from an irregular heartbeat, thickening of the heart wall, and elevated blood pressure and heart rate. The doctors also agree that Gigante has a greater risk of heart failure than an average person.

On January 30, 1995, Dr. Wechsler testified that Gigante's blood pressure and heart rate can increase significantly in unfamiliar or stressful situations. Dr. Wechsler said that such rapid elevations of blood pressure and heart rate can cause a variety of complications, including heart failure. He believes that the stress of court proceedings would place Gigante at risk of suffering these complications.

On the same day, Dr. Weld testified that Gigante had improved markedly since his 1988 surgery and that by 1995 he was "in far better shape" than he was when Dr. Weld examined him in 1990. Dr. Weld also stated that "there is no evidence that a type of external stress is likely to increase Mr. Gigante's likelihood of death." Dr. Weld concluded that "within a reasonable medical degree of certainty" he saw "no evidence" that Gigante will develop "fatal arrhythmias" from attending trial proceedings.

From this testimony, the court finds that Gigante has not shown that a trial at this time would subject him to a substantial additional risk of heart failure.

### Activities Outside the Courtroom

The court has little reliable evidence about Gigante's current activities outside the courtroom. Although Gigante's attorneys say that he now leads a very narrow existence, lives at home with his mother, sees only a small group of friends and family, and rarely leaves his mother's apartment, they and others have long described in similar terms his lifestyle between 1980 and September of 1991. The court has since found that this portrait of Gigante's life was inaccurate and that he actually led an active and stressful existence during that period.

As described in the Findings, over those years, Gigante travelled in the middle of the night to the Upper East Side townhouse of Olympia Esposito, was driven quickly to "lose" law enforcement surveillance, attended clandestine meetings with his colleagues in organized crime, and made important decisions involving large sums of money and the fate of certain individuals. Most important, Gigante engaged in an extensive scheme to convince law enforcement and his doctors that he was insane.

Because of Gigante's history of elaborate deception, the court cannot credit representations as to his current lifestyle. Moreover, the court has already found that Gigante engaged in extremely stressful activities between 1988 and 1991. As Dr. Weld has noted, Gigante in 1988 underwent invasive heart surgery, an event at least as stressful as a trial. That Gigante was then able to

withstand severe stresses suggests that he will now be able to weather a trial.

### Measures to Minimize Health Risks

As other courts have noted, the court can take various measures to minimize the risks that a long trial might impose on Gigante's health. For example, the court can reduce the length of the court day or week and increase the length and frequency of recesses, *see, e.g., Jones,* 876 F.Supp. at 399, and can also ensure the presence of doctors or other needed medical aids. *See United States v. Knohl,* 379 F.2d 427, 437 (2d Cir.), *cert. denied,* 389 U.S. 973, 88 S.Ct. 472, 19 L.Ed.2d 465 (1967).

Gigante's doctors have stated that his apparent anxiety is most extreme when he first enters unfamiliar surroundings. Assuming, *arguendo,* that this anxiety is genuine, the court notes that over the course of a trial Gigante will become familiar with the courthouse and the various players in the proceeding. The court can also devise means to shield Gigante from crowds of unfamiliar people.

### The Character of the Impairment

Gigante's physical condition seems unlikely to improve. Both doctors testified that his porcine heart valve will eventually deteriorate and that at that time his health will decline. Because Gigante may never be more capable of standing trial than he is today, the permanent and possibly progressive nature of his ailment weighs against permitting a continuance at this time. *See Gambino,* 809 F.Supp. at 1079; *United States v. DePalma,* 466 F.Supp. 920, 926 (S.D.N.Y.1979).

### The Magnitude and Seriousness of the Case

As already discussed, the indictments in this case charge Gigante with serious crimes: six murders, conspiracy to commit three other murders, and various crimes of labor payoffs, extortion, and mail fraud. Determining a defendant's physical competency requires the court to weigh "the invariably unpredictable factor of a defendant's health against

the Government's, indeed the public's, interest in a fair and speedy disposition." *Bernstein v. Travia*, 495 F.2d 1180, 1182 (2d Cir.1974). Where a defendant is charged with crimes as serious as those Gigante faces, the interest in a speedy disposition is plain.

### IV

Following a full hearing under 18 U.S.C. § 4241, the court finds Gigante able to understand the nature and consequences of the proceedings against him and to assist properly in his own defense. The court also finds that a trial at this time would not pose a "substantial danger" to Gigante's health. Accordingly, the court deems Gigante fit to stand trial and directs that he appear for arraignment on the indictments.

So ordered.