15-1645 (L)
*United States v. Granton & Hardy*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

# SUMMARY ORDER

**Rulings by summary order do not have precedential effect. Citation to a summary order filed on or after January 1, 2007, is permitted and is governed by Federal Rule of Appellate Procedure 32.1 and this Court's Local Rule 32.1.1. When citing a summary order in a document filed with this Court, a party must cite either the Federal Appendix or an electronic database (with the notation "summary order"). A party citing a summary order must serve a copy of it on any party not represented by counsel.**

        At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 21st day of August, two thousand seventeen.

PRESENT:    JOSÉ A. CABRANES,
            GERARD E. LYNCH,
                    *Circuit Judges*,
            KIYO A. MATSUMOTO,
                    *District Judge.*[*]

UNITED STATES OF AMERICA,

            *Appellee*,                                15-1645-cr, 15-1716-cr

        v.

AARON GRANTON AND DAMION HARDY,

            *Defendants-Appellants*.

**FOR DEFENDANT-APPELLANT GRANTON:**    ROBERT M. BEECHER, The Law Office of Robert M. Beecher, Esq., New Providence, NJ.

---

    [*] Judge Kiyo A. Matsumoto, of the United States District Court for the Eastern District of New York, sitting by designation.

**FOR DEFENDANT-APPELLANT HARDY:**     BRENDAN WHITE, White & White, New York, NY.

**FOR APPELLEE:**     MATTHEW S. AMATRUDA (Peter A. Norling, *on the brief*), Assistant United States Attorneys, *for* Robert L. Capers, United States Attorney for the Eastern District of New York, Brooklyn, NY.

Appeal from an order of the United States District Court for the Eastern District of New York (Frederic Block, *Judge*).

**UPON DUE CONSIDERATION WHEREOF, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the May 19, 2015 and May 21, 2015 judgments of the District Court be and hereby are **AFFIRMED**.

Defendants-appellants Aaron Granton and Damion Hardy ("Defendants") were convicted upon jury verdict of racketeering, in violation of 18 U.S.C. § 1962(c); murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1); kidnapping in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(5); distribution of cocaine base, in violation of 21 U.S.C. § 841(a); as well as several other offenses, including conspiring to commit each of the foregoing crimes. They were sentenced principally to life terms of imprisonment. Defendants now challenge their judgments of convictions in this consolidated appeal. Defendants challenge—either jointly or independently[1]—the District Court's decision finding Hardy competent to stand trial, the use of an anonymous jury, the sufficiency of the evidence, certain evidentiary rulings, and certain colloquies between the District Court and certain witnesses. We affirm.

## BACKGROUND

Hardy was the leader of a violent gang of drug-traffickers who called themselves the Cash Money Brothers ("CMB").[2] Granton worked his way up the ranks of CMB to become a lieutenant, enforcer, and hit-man. The gang controlled Lafayette Gardens in Bedford-Stuyvesant for over a

---

[1] Rather than filing a consolidated brief, Hardy and Granton filed separate briefs, and Hardy additionally filed his own reply brief and a supplemental brief, in which Hardy appeals the District Court's denial of his *pro se* motion to dismiss the indictment. Granton has expressly adopted all arguments in Hardy's brief and reply brief, *see* Granton Br. 2, but Hardy has not done the same with respect to Granton's brief. Since all of the arguments made in either brief are unavailing, it is largely inconsequential on whose behalf, exactly, a given argument has been offered. Nevertheless, we specify in our discussion where an argument has been raised by Granton alone.

[2] The name paid homage to the gang in the 1991 film "New Jack City," which portrayed drug dealers in a New York City housing project.

decade, claiming the housing project as their "turf" and threatening or killing others who attempted to sell drugs there. The evidence at trial detailed several murders committed by and for CMB, including murders ordered by Hardy and murders committed by Granton, as well as instances where CMB members shot at and/or threatened witnesses, or potential witnesses, who might testify against CMB members. The indictment alleged, and the jury found, that CMB operated as a RICO enterprise between 1991 and August 2004.

We otherwise generally assume the parties' familiarity with the underlying facts, the procedural history of the case, and the issues on appeal.

## DISCUSSION

### (1) Hardy's Competence To Stand Trial

Hardy is schizophrenic and, by 2004, suffered from messianic delusions, claiming to be the rapper known as "T.I.," a biblical prophet, or the President of the United States. Hardy also professed a belief in "Ethou Law," which he insisted required his immediate release.

In the time period following Defendants' August 2004 indictment, Hardy was initially ruled competent to stand trial by Judge David G. Trager, to whom this case was then assigned. By 2007, however, Hardy had grown increasingly uncooperative with defense counsel and was making increasingly bizarre statements. The Government moved for a new psychiatric evaluation, *see* 18 U.S.C.A. § 4241(a) ("[T]he defendant or the attorney for the Government may file a motion for a hearing to determine the mental competency of the defendant."), and in 2007 Hardy was ruled incompetent to stand trial following an evaluation, and again incompetent in 2008 following a third evaluation.

Further evaluations and court hearings followed, in the midst of which the case passed from Judge Trager to Judge Block. In 2012, Judge Block concluded that Hardy was a danger to others and ordered him forcibly medicated on that ground, as well as on the alternative ground that this medication would likely render him competent to stand trial. In August 2013, we affirmed the order to medicate Hardy. *See United States v. Hardy*, 724 F.3d 280, 296–97 (2d Cir. 2013). Medication, further evaluations, and two court hearings followed. Ultimately, on April 1, 2015, the District Court found Hardy competent to stand trial.

"It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." *Drope v. Missouri,* 420 U.S. 162, 171 (1975). To find a defendant competent to stand trial, a district court must find that the government has shown by a preponderance of the evidence that the defendant has "(1) 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and (2)

3

'a rational as well as factual understanding of the proceedings against him.'" *United States v. Morrison*, 153 F.3d 34, 46 (2d Cir. 1998) (quoting *United States v. Nichols*, 56 F.3d 403, 410 (2d Cir. 1995)); *see* 18 U.S.C. § 4241(d); *Brown v. Warden, Great Meadow Corr. Facility*, 682 F.2d 348, 353–54 (2d Cir. 1982). "We [will] uphold a district court's finding that a defendant is competent to stand trial unless that finding is clearly erroneous. Where the record on competency may plausibly be read to indicate the defendant may not have been competent, we still defer to the judgment of the district court, which had the benefit of examining the defendant and hearing from the fact and expert witnesses in person." *Morrison*, 153 F.3d at 46 (internal quotation marks, citation, and brackets omitted). "[D]eference is owed to the district court's determinations based on observation of the defendant during the proceedings." *United States v. Vamos*, 797 F.2d 1146, 1150 (2d Cir. 1986).

Applying those standards here, we find no clear error in the District Court's determination. Hardy does not appear to argue that he lacks the ability "'to understand the nature and consequences of the proceedings,'" and his challenge focuses on his ability "'to assist properly in his defense.'" Hardy Br. 27 (quoting 18 U.S.C. § 4241). As the District Court observed, however, after being medicated, Hardy was able to file *pro se* motions that "reflect[ed] Hardy's ability to present logical (if incorrect) legal arguments in an articulate manner," Hardy App'x 211, and his demeanor in court significantly improved. Additionally, in certain ways, Hardy exhibited a sophisticated understanding of the dynamics of a criminal case, including the advantages of cooperation with the Government. Finally, Dr. Leanne Preston-Baecht, a psychologist with the United States Bureau of Prisons—who was assigned to be Hardy's primarily clinical psychologist for four months in 2008 and from November 2011 to December 2014—deemed him competent to stand trial in November 2014, after he had been receiving medication for nearly a year (in contrast with Dr. Preston-Baecht's 2008 evaluation, undertaken prior to Hardy's being medicated, in which she had concluded that Hardy was not competent to stand trial).

It is true that the *defense* expert still found Hardy incompetent to stand trial—due, primarily, to Hardy's still harboring delusions about a supposed Supreme Court case that had ordered his release under Ethou law, and Hardy's insistence that, consequently, prosecutors would release him if he spoke to them. Such beliefs were clearly unsound and may have been a product of mental illness, but "[i]t is well-established that some degree of mental illness cannot be equated with incompetence to stand trial." *Vamos*, 797 F.2d at 1150. Moreover, as noted, Hardy does not argue that he was unable to understand the nature and consequences of the proceedings, but argues that he was unable to assist in his defense. Although Hardy may have harbored delusional beliefs about a fictional Supreme Court case, Hardy's counsel has not asserted or even suggested that it was not possible to have Hardy consider and assist with other defenses.

Even if the question may have been a close one for the District Court deciding the matter in the first instance, it bears emphasis that, here, we are *not* deciding the matter in the first instance. Giving the deference due the District Court's decision, and reviewing for clear error, the question

4

presented on appeal is not a close one. *See, e.g.*, *United States v. Gigante*, 166 F.3d 75, 84 (2d Cir. 1999) (describing competency review as "highly deferential," and observing that choosing between "two permissible views of the evidence" does not manifest clear error (internal quotation marks omitted)). Accordingly, the District Court did not clearly err.

### (2) Use of an Anonymous Jury

Granton challenges the District Court's decision to empanel an anonymous jury. The legal standards governing the use of an anonymous jury are well established. *See United States v. Wong*, 40 F.3d 1347, 1376 (2d Cir. 1994). An anonymous jury may be empanelled when there is "strong reason to believe the jury needs protection" and the district court "tak[es] reasonable precautions to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are protected." *United States v. Paccione*, 949 F.2d 1183, 1192 (2d Cir. 1991). "Within these parameters, the trial court is accorded broad discretion to determine whether to empanel an anonymous jury." *Wong*, 40 F.3d at 1376.

Here, the District Court did not err or "abuse its discretion" by empanelling an anonymous jury. In granting the Government's motion for an anonymous jury, the District Court based its decision "on the serious nature of the charges, which include a charge of attempted murder of a cooperating witness, and Mr. Hardy's prior conviction for witness tampering" as well as its finding that Defendants "still have the means of juror intimidation at their disposal." Granton Br. 43–44. Furthermore, "[t]o protect against any possible prejudice to the defendants," the District Court told prospective jurors that it would be using a "number" system in order "to protect their privacy because of the media coverage the case might generate." *Id.* at 44. The case had indeed garnered media attention, because Hardy used to date a famous rapper, and because the Government had initially sought the death penalty for Hardy (a position it later abandoned). This media attention, as the District Court noted, was itself a concern. *See United States v. Vario*, 943 F.2d 236, 240 (2d Cir. 1991) ("Pre-trial publicity may militate in favor of an anonymous jury because it can enhance the possibility that jurors' names would become public and thus expose them to intimidation by defendants' friends or enemies, or harassment by the public." (citation and internal quotation marks omitted)). Accordingly, it was not error to empanel an anonymous jury.

### (3) Sufficiency of the Evidence

We analyze the sufficiency of the evidence "in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *United States v. Chavez*, 549 F.3d 119, 124 (2d Cir. 2008) (internal quotation marks, citations, and alterations omitted).

5

"In order to secure a conviction under RICO, the Government must prove both the existence of an 'enterprise' and the connected 'pattern of racketeering activity.'" *United States v. Turkette*, 452 U.S. 576, 583 (1981). "[A]n association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009). The Government can prove an enterprise "by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Id.* at 945 (quoting *Turkette*, 452 U.S. at 583). Significantly, "the evidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise 'may in particular cases coalesce.'" *Id.* at 947 (same). "We are mindful that 'the existence of an association-in-fact is oftentimes more readily proven by what it does, rather than by abstract analysis of its structure.'" *United States v. Burden*, 600 F.3d 204, 215 (2d Cir. 2010) (quoting *United States v. Coonan*, 938 F.2d 1553, 1559 (2d Cir. 1991)).

Here, there was sufficient evidence that CMB constituted an associated-in-fact enterprise. Indeed, Defendants do not even dispute that CMB existed as an enterprise through approximately 1999. Instead, relying on *United States v. Morales*, 185 F.3d 74, 81 (2d Cir. 1999), Defendants argue that the enterprise did not continue, as charged in the indictment, through 2004. In particular, Defendants emphasize the following points: (a) Hardy sometimes installed others to run the enterprise while he was imprisoned and CMB's membership changed generally; (b) Hardy also became a member of another gang, the "Bloods," in 1999; and (c) the racketeering acts were committed with personal motives.

None of those points refutes the existence of the associated-in-fact enterprise in this case. Associated-in-fact enterprises need not have a fixed hierarchy as "different members may perform different roles at different times." *Boyle*, 556 U.S. at 948; *see, e.g.*, *Coonan,* 938 F.2d at 1560 (rejecting argument that RICO enterprise ceased to exist upon leader's imprisonment because "even while in jail [he] continued to act as leader of the [enterprise] and the [enterprise's] criminal activities continued without significant disruption"); *cf. Morales*, 185 F.3d at 81 (concluding, upon review of an alleged nine-year enterprise, that the government "did not present sufficient evidence to show that the enterprise continued during the seven-year period . . . [in which *all* of] the defendants were incarcerated"). As for Hardy's joining the Bloods in 1999, the evidence indicated that Hardy joined the Bloods largely as a ruse to manipulate others; in any event, membership in one group does not disprove the existence of another group or one's membership in, or even one's leadership of, that other group—here, CMB.

6

Finally, even assuming it is correct that CMB members sometimes acted out of personal motivation, individuals can act with personal motivation while being a part of—and acting in furtherance of—an enterprise.[3]

### (4) Evidentiary Rulings

Granton summarily challenges the admission of evidence regarding several bad acts that went to establishing the existence and nature of the RICO enterprise. These challenges have no merit. Nearly all the evidence was not objected to before the District Court, and its admission does not constitute error, much less plain error. With respect to certain evidence, Granton did request a limiting instruction. The District Court issued such a limiting instruction to the jury, and Granton did not object or request anything further.

In sum, the District Court did not abuse its discretion or commit plain error in its evidentiary rulings.

### (5) Colloquies between the District Court and Certain Witnesses

Granton complains of two colloquies the District Court had with witnesses. The first colloquy arose during cooperating witness Allen Bryant's testimony regarding Granton's shooting of J.R. Hamilton. During that shooting, Granton's gun jammed twice, and each time Granton unjammed it to continue firing. Bryant testified that these acts increased Granton's reputation "[b]ecause it takes a lot of heart to shoot like that." Gov't App'x 18. The prosecutor asked Bryant what he meant by that, defense counsel objected, and Judge Block's decision to overrule the objection led to this colloquy with the witness:

> THE COURT: No, overruled. It takes a lot of heart, they're not very sensitive about killing somebody. You don't mean that, do you? That's heart when you care about another human being.
>
> THE WITNESS: No. I'm using in the slang term. Courage.
>
> THE COURT: The slang term means that they don't care about whether they kill somebody or not, right?
>
> THE WITNESS: No.
>
> THE COURT: So you tell what "heart" means.

---

[3] Hardy's appeal, asserted in his supplemental brief, of the District Court's denial of his *pro se* motion to dismiss the indictment on the ground that it failed to allege an overt act in support of its conspiracy charge is without merit, because, as Hardy's counsel concedes, *see* Hardy Supplemental Br. 7, Hardy was charged under 21 U.S.C. § 846, which does not require that an overt act be alleged. *See United States v. Shabani*, 513 U.S. 10 (1994).

THE WITNESS: Heart means that it took a lot of courage for him to do that.

THE COURT: It took him a lot of courage to kill somebody?

THE WITNESS: No. For the gun.

THE COURT: To unjam it?

THE WITNESS: To unjam it and go back to the scene.

THE COURT: To unjam it and go back and shoot somebody?

THE WITNESS: Yes.

THE COURT: Next question.

*Id.* at 18–19.

The second colloquy occurred during the testimony of cooperating witness Robert Footman. As the Government elicited testimony from Footman that he had committed shootings for Hardy, the District Court began asking questions after Footman stated he did not how to respond to questions asking whether he was Hardy's "hit-man" or "shooter":

THE COURT: Well, if [Hardy] told you to shoot somebody, you would do it; right?

THE WITNESS: Yes.

THE COURT: That was all you needed to know; right?

THE WITNESS: Yes.

[DEFENSE COUNSEL]: Objection, Your Honor.

THE COURT: I am just trying to get clarification. Who is objecting? I just want to get clarification that you would just shoot people if somebody told you to shoot people; right? No compunctions about that. You are not going to do that today, are you?

THE WITNESS: No.

THE COURT: That is in the past; right?

THE WITNESS: Yes.

THE COURT: You are out there, we do not have to worry about you; right?

THE WITNESS: No.

*Id.* at 58.

This type of questioning and commentary by a district court can be a source of prejudice undermining the integrity of a trial. But, as Granton himself acknowledges, "[t]he vital question is not whether the trial judge's conduct left something to be desired but whether his behavior was so prejudicial that it denied appellant a fair, as distinguished from a perfect, trial." *United States v. Bejasa*, 904 F.2d 137, 141 (2d Cir. 1990) (internal quotation marks and alterations omitted). Here, in light of the particulars of the District Court's colloquies, the overwhelming evidence of Defendants' serious

8

and violent crimes, as well as the long curative instruction issued by the District Court, *see* Gov't App'x 59, we are confident that Defendants received a fair trial.

## CONCLUSION

We have reviewed all of the arguments raised by Granton and Hardy on appeal and find them to be without merit. For the foregoing reasons, we **AFFIRM** the May 19, 2015 and May 21, 2015 judgments of the District Court.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk