12-2951
USA v. Hardy

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2012

(Argued: April 10, 2013                                  Decided: August 2, 2013)

Docket No. 12-2951

_____

UNITED STATES OF AMERICA,

Appellee,

- v. -

DAMION HARDY, aka WORLD,

Defendant-Appellant.
_____

Before: KEARSE, WALKER, and CHIN, Circuit Judges.

Appeal from an order of the United States District Court for the Eastern District of New York, Frederic Block, Judge, granting motion of the United States to authorize the Bureau of Prisons to medicate mentally ill defendant without his consent, on the principal ground that he is a danger to others and that medication is medically appropriate. See 878 F.Supp.2d 373 (2012).

Affirmed.

JAMES P. LOONAM, Assistant United States Attorney, Brooklyn, New York (Loretta E. Lynch, United States Attorney for the Eastern District of New York, Peter A. Norling, Assistant United States Attorney, Brooklyn, New York, on the brief), for Appellee.

FRANCISCO E. CELEDONIO, New York, New York (David A. Ruhnke, Ruhnke & Barrett, Montclair, New Jersey, on the brief), for Defendant-Appellant.

KEARSE, Circuit Judge:

Defendant Damion Hardy, who is being detained at a hospital facility operated by the United States Bureau of Prisons ("BOP") pending trial on charges of, inter alia, drug trafficking, racketeering, and murder, and who has been found incompetent to stand trial, appeals from an order of the United States District Court for the Eastern District of New York, Frederic Block, Judge, granting the government's motion to authorize BOP medical personnel to treat Hardy with antipsychotic medications despite his unwillingness to undergo such treatment. The district court concluded that involuntary medication of Hardy is warranted because such treatment is medically appropriate, and it both is necessary for the protection of others, see Washington v. Harper, 494 U.S. 210 (1990) ("Harper"), and is appropriate in order to restore Hardy's competence to stand trial, see Sell v. United States, 539 U.S. 166 (2003). On appeal, Hardy contends principally (1) that involuntary medication pursuant to Harper is not necessary because his actions are non-violent and/or can be controlled by BOP staff and procedures; and (2) that the district court erred in concluding that the Sell test had been met because the government failed to show that there was a substantial likelihood that his competency could be restored with the use of antipsychotic medication. For the reasons that follow, we affirm the district court's order.

2

# I. BACKGROUND

Hardy was arrested in August 2004. The one-count indictment filed against him in that month alleged, <u>inter alia</u>, that he was an organizer and leader of an extensive narcotics trafficking gang; it charged him with conspiring to distribute at least 1.5 kilograms of cocaine base (or "crack"), in violation of 21 U.S.C. § 846. The current 26-count superseding indictment, filed in January 2008, charges Hardy in 24 counts with, <u>inter alia</u>, racketeering conspiracy, narcotics trafficking conspiracy, use of firearms, and six murders in aid of racketeering. With respect to one of the murders, the government has filed notice of its intent to seek the death penalty.

## A. <u>Psychological Evaluations of Hardy's Competence To Stand Trial</u>

In September 2004, the district court granted a motion by the government pursuant to 18 U.S.C. § 4241 for a psychiatric or psychological examination of Hardy to evaluate his competence to stand trial. In a "Competency To Stand Trial Evaluation" dated October 17, 2004 ("BOP 2004 Report"), the BOP psychologist who had attempted to interview Hardy reported that those attempts had been impeded by Hardy's refusal to cooperate with psychological testing. However, the report stated, <u>inter alia</u>, that Hardy "was fully oriented to time, place, person, and circumstance"; that "[h]e exhibited no trouble with attention and concentration"; that he "showed no signs of expressive or receptive speech difficulties"; that "[h]is speech was logical[] and coherent"; and that "[h]is thinking appeared organized . . . ." (BOP 2004 Report at 4.) The report noted that Hardy appeared to be preoccupied with religion, that much of his speech was irrelevant to the question of his comprehension and competency, and that the irrelevance appeared to be a matter of choice. (<u>See id</u>.;

see also id. at 5 (Hardy "continuously repeated when the interviewer attempted to discuss topics other than religion that he was choosing not to discuss them.").) The psychologist noted that Hardy's defense attorney stated that Hardy "knows what the charges are, the background, specific events, legal arguments, and the court process"; that Hardy's "mind is clear and . . . . [h]e is very sharp"; and that Hardy was able to assist in his defense. (Id. at 5-6 (internal quotation marks omitted).) The psychologist concluded by giving her opinion

> that Mr. Hardy does not possess a Mental Disease or Defect that interferes with his ability to have a rational and factual understanding of the proceedings against him, to assist legal counsel in his defense if he chooses to, and to rationally make decisions regarding legal strategy. Therefore, it is the opinion of this evaluator that Mr. Hardy is Competent to Stand Trial.

(Id. at 6-7.) Thereafter, Hardy's mental condition deteriorated.

In 2007, Judge David G. Trager, to whom the case was then assigned, granted the government's motion for an order that Hardy undergo a new psychiatric or psychological examination. In a "Competency To Stand Trial Evaluation" dated January 22, 2008 ("BOP January 2008 Report"), the BOP psychologist who conducted the new examination stated that since 2004, "Mr. Hardy appears to have become less cooperative with counsel and has made increasingly bizarre statements"; he opined that Hardy had "grandiose and hyper-religious beliefs" that "are genuinely delusional in nature." (BOP January 2008 Report at 8.) This report concluded with the opinion that "[b]ecause Mr. Hardy did not cooperate with the evaluation, conclusions are speculative and lack the usual level of psychological certainty. However, it is the opinion of this evaluator that Mr. Hardy is currently Not Competent to Stand Trial." (Id. at 9.)

In March 2008, the district court ordered another psychiatric or psychological examination. In the ensuing "Forensic Report" dated July 2, 2008 ("BOP July 2008 Report"), the

4

BOP psychologist who conducted this examination concluded that "Hardy suffers from Schizophrenia" and that his "mental disease or defect . . . renders him unable to understand the nature and consequences of the proceedings against him, or to assist properly in his defense." (BOP July 2008 Report at 17.) Thereafter, the district court found, by a preponderance of the evidence, that Hardy was "presently incompetent to stand trial." Order dated July 29, 2008 ("2008 Competency Order"). In that order, the court committed Hardy "to the custody of the Attorney General" for 120 days' hospitalization "in order to determine whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit the proceedings to go forward." Id.

Pursuant to the 2008 Competency Order, Hardy was transferred to BOP's Medical Center for Federal Prisoners in Springfield, Missouri ("Springfield") in October 2008.

B. Medical Evaluations in 2008-2009 as to the Likely Success of Treating Hardy with Antipsychotic Medication

The original impetus for Hardy's psychiatric and psychological examinations was the issue of his competence to stand trial; the initial focus of the evaluations at Springfield was whether medication would restore him to that level of competency. Hardy's conduct at that facility--and at other BOP facilities--led the psychiatric and psychological inquiry to encompass the additional issue of whether such medication was needed for the safety of BOP staff and other inmates.

The proceedings spanned several years. As described below, administrative hearings were held in 2008 and 2011; written reports were submitted by BOP medical personnel in 2009; opinions were submitted by medical experts retained by the defense in 2009 and 2011; and the authors of those reports and opinions testified at district court hearings in 2009 and/or 2012. At the 2012

5

hearing, the court also heard testimony from numerous BOP guards as to Hardy's aggressive conduct, which had been described in incident reports, copies of which were submitted to the court.

### 1. The 2008 Administrative Hearing

Following Hardy's arrival at Springfield, given his lack of consent to receive medication, an administrative hearing was held--as a matter of BOP routine policy--to determine whether Hardy posed a danger to himself or others and whether involuntary medication should be recommended. The resulting "Involuntary Medication Report" dated January 20, 2009 ("BOP January 2009 Report"), written by Dr. Carlos Tomelleri, a nontreating BOP psychiatrist who conducted the hearing, concluded that involuntary medication was not recommended at that time:

> For the last nine months Mr. Hardy has not engaged in behavior that would appear dangerous to others. The episode of pulling away from officers was explained by Mr. Hardy as being upset that he was not being released. He did not verbalize any further thoughts of aggression toward officers or other staff. Likewise, Mr. Hardy has not manifested any thoughts or actions indicative of potential self injury.

(BOP January 2009 Report at 5.) However, Dr. Tomelleri also noted that

> [r]egarding restoration of competency, treatment of psychotropic medication has a substantial probability of improving Mr. Hardy's mental condition to the point where he could fulfill conditions necessary to proceed with his legal case.

(Id. at 6.)

### 2. BOP Doctors' Views as to the Likely Value of Treatment

Pursuant to the 2008 Competency Order, BOP medical personnel at Springfield observed Hardy and issued two reports in February 2009, giving their opinions as to whether there

was a substantial likelihood that medication would be effective to render Hardy competent to stand trial. In a February 2, 2009 "Psychiatric Report" ("BOP February 2, 2009 Report"), BOP psychiatrist Dr. Robert G. Sarrazin diagnosed Hardy with schizophrenia, stating, inter alia, that Hardy "remains extremely delusional, particularly in light of the fact that he states that there is no case against him . . . ." (BOP February 2, 2009 Report at 3.) Dr. Sarrazin concluded, however, that with antipsychotic medications "there is a substantial probability that Mr. Hardy's competency status can be restored . . . ." (Id. at 15.)

In so concluding, Dr. Sarrazin relied in part on the American Psychiatric Association's "Practice Guideline for the Treatment of Patients with Schizophrenia," which indicated that generally about 10-30% of patients receiving antipsychotic medications have little or no response to medication and that an additional 30% have only a partial response to such treatment. (See id. at 5.) Thus, under the least optimistic interpretation of the data, Hardy had a 40% chance of restoration to competency; under the most optimistic, he had a 90% chance. (See id. at 5-6.) Dr. Sarrazin estimated that greater, rather than less, optimism was warranted for Hardy's prognosis because, although "patients who have prominent negative symptoms are . . . less likely to respond to medication treatment" than those who do not, Hardy lacked such symptoms and had a "relatively high level of social functioning despite his low level thought disorder." (Id. at 15.) Dr. Sarrazin also cited several empirical studies that had shown that involuntary treatment with antipsychotic medication to restore the competency of various inmates who suffered from mental conditions similar to Hardy's had resulted in favorable responses in the range of 75-87% of the patients. (See id. at 3-5.) The BOP February 2, 2009 Report ultimately estimated that the likelihood of success for Hardy would be in that range. (See id. at 11.)

7

Dr. Sarrazin described possible side effects of antipsychotic medications and noted that the most serious side effects were also the most rare. (See BOP February 2, 2009 Report at 6-9.) The report stated, moreover, that any side effects could be prevented and/or controlled through a well-planned, progressive treatment plan. (See id. at 7-9, 15.) In particular, Dr. Sarrazin wrote that, with respect to the proposed treatment plan for Hardy,

> [t]he goal is to achieve clinical improvement at the lowest effective dose starting at the low end of the dosing range and gradually increasing the dose as clinically indicated. If Mr. Hardy developed intolerable side effects to any one of the medications that was [sic] not amenable to dosage adjustment or addition of adjunctive medication, the treatment regimen would be switched to another of the antipsychotic medications . . . .

(Id. at 13.) In the event that Hardy was not amenable to oral medication, "injections of long acting antipsychotic medication" would be given after Hardy received "a test dose" to "identify any rare idiosyncratic reactions to this medication." (Id.)

A "Forensic Report" dated February 10, 2009 ("BOP February 10, 2009 Report"), by Dr. Lea Ann Preston-Baecht, the BOP psychologist attending Hardy, detailed Hardy's background and medical history. This report indicated that Hardy's family reportedly had noted changes in his behavior in 2002 or 2003 when he converted to Islam and became increasingly preoccupied with religion. (See BOP February 10, 2009 Report at 5.) Dr. Preston-Baecht also relayed the contents of a January 2004 interview of Hardy on a New York City radio program, in which Hardy had "made repeated references to conspiracies among the Masons and Jews," had stated that "his relationship with Lil' Kim had ended because she was 'part of the secret society of the Masons,'" and he had "insisted various rappers were Masonic members and homosexuals and that the Masons had tried to get Lil' Kim to 'get me join the homo club.'" (Id.) The report continued that "[i]n April 2004, Mr. Hardy traveled to the Middle East, where he stayed for four months. He reportedly flew to Jordan and

went to the royal palace in order to urge the King of Jordan to step down . . . . He reportedly traveled to Morocco and was arrested after he twice tried to visit the King of Morocco. He was returned to Jordan and arrested for speaking against the King of Jordan." (Id.)

As to her interactions with Hardy, Dr. Preston-Baecht commented that Hardy "consistently refused to speak with" her, and when he did, Hardy spoke about something he called "'Ethou law'":

> "It goes into effect four years, two months and 17 days from when the Court learns there is no case. . . If they don't do it, it's over. That's it. If a person is not released on day of the time limit, then the President of the United States signs an order for soldiers to go into the jail and get that person. . . It's an unusual law. No one can change it. Not even the Supreme Court."

(BOP February 10, 2009 Report at 9.) Hardy continued that "the Judge in his case 'in August 2004 . . . [s]tated I was to be released on November 3, 2008'" (id.), and Hardy "insisted that he was being held illegally" (id. at 10).

Based on her observations and her review of Hardy's background, Dr. Preston-Baecht diagnosed Hardy with paranoid schizophrenia. (See id. at 11.) She believed, however, that "[t]reatment with anti-psychotic medication . . . would likely reduce the intensity of Mr. Hardy's psychotic symptoms and improve his mental status to the level where he would be considered competent to stand trial." (Id. at 13.) Further, Dr. Preston-Baecht opined that "alternative, less intrusive treatments (e.g., psychotherapy, education, etc.) are unlikely to achieve substantially the same results." (Id. at 14.) Finally, Dr. Preston-Baecht noted that "medication side effects are routinely managed by thousands of American psychiatrists in daily clinical practice, who assess the risks and benefits of any particular medication in treating their patients" (id. at 13), and "it is well-established in the literature that the standard treatment for Mr. Hardy's mental illness is anti-psychotic medication" (id. at 14).

9

### 3. The Views of Doctors Retained by the Defense

To oppose the conclusions reached by Drs. Sarrazin and Preston-Baecht, Hardy submitted two written opinions in 2009 by psychiatrist Dr. Richard G. Dudley, Jr. (and a similar opinion by a psychologist in 2011). Dr. Dudley had met with Hardy on two occasions, reviewed Hardy's medical records, and interviewed Hardy's family. In opinion letters dated August 15, 2009 ("Dudley August 2009 Opinion"), and September 19, 2009 ("Dudley September 2009 Opinion"), Dr. Dudley concluded that there was not a substantial likelihood that Hardy could be restored to competency through the administration of antipsychotic medication. (See Dudley August 2009 Opinion at 1-2; Dudley September 2009 Opinion at 3.) Dr. Dudley relied principally on the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision to evaluate factors that would influence Hardy's prognosis. In Dr. Dudley's opinion, all of the prognostic factors were negative in light of, inter alia, the facts that Hardy "ha[d] suffered from Schizophrenia for much more than 5 years," that he had "never been treated for his illness," that "there is a family history of Schizophrenia," that "his thinking is not only paranoid but also often disorganized," and that "there was poor premorbid functioning." (Dudley September 2009 Opinion at 3; see also Dudley August 2009 Opinion at 1 ("[I]t has been well established that some persons who suffer from Schizophrenia, especially those who never obtain psychopharmacologic treatment, show a progressive worsening of the disease with a persistence of many of their symptoms and a resultant severe disability.").) Because "early intervention . . . is so much more likely to result in a good response to treatment compared to initiating treatment in a person who has already become chronically ill," and because Hardy's condition had been untreated for several years and his symptoms were "increasingly chronic/unremitting" (Dudley August 2009 Opinion at 2), Dr. Dudley opined that the most pessimistic data cited by Dr. Sarrazin "are much more relevant to an understanding of the possibility of restoring

10

[Hardy] to competency" and that Hardy was in the group least likely to respond positively (Dudley September 2009 Opinion at 3). Dr. Dudley indicated that many of Dr. Sarrazin's cited studies "would be relevant to a newly ill individual," but that they were not relevant "to chronically ill persons such as Mr. Hardy." (Dudley August 2009 Opinion at 2.)

Finally, as to side effects, Dr. Dudley wrote that because Hardy was unlikely to accept oral medications, he would be subject to first-generation injections that are "the group most likely to cause the more serious adverse effects," effects that are more likely to occur at higher potencies. (Dudley September 2009 Report at 4-5.) Dr. Dudley also noted that Hardy was at particular risk of seizures given that he has a history of seizures of unknown etiology. (See id. at 5.)

4. Testimony at the 2009 Hearing

Judge Trager held a hearing on August 25, 2009, and November 24, 2009, to allow the respective experts to testify and be questioned. At the August hearing, Drs. Sarrazin and Preston-Baecht reiterated the views set forth in their respective February 2009 reports, described in Part I.B.2. above, that there was a substantial likelihood that Hardy's competency could be restored with the use of antipsychotic medications and that competency was unlikely to be restored without such medication. (See, e.g., Hearing Transcript, August 25, 2009 ("Aug. 2009 Tr."), at 44-45, 4-15.) Dr. Preston-Baecht added that "in general the vast majority of [her] patients who have had to be involuntarily medicated have been restored to competency . . . . More than 75 percent have been restored." (Id. at 26.)

With respect to the likelihood of successful medication, Dr. Sarrazin agreed with Dr. Dudley that the earlier the patient receives treatment, the better the prospects for a positive response (see id. at 69-70). Dr. Sarrazin testified that among Hardy's positive prognostic factors were his

11

ability to interact socially and the fact that Hardy was diagnosed with paranoid schizophrenia as contrasted with undifferentiated or disorganized schizophrenia. (See id. at 103-05.) He acknowledged that Hardy did not have many other positive prognostic indicators. (See, e.g., id. at 69-79.)

Dr. Sarrazin also admitted that 30 percent of the responsive patients relapsed within a year of treatment. (See Aug. 2009 Tr. 71-72.) However, responding to the district court's concern that Hardy might regain competency but not retain it for the duration of his case, Dr. Sarrazin testified that such a relapse would be unlikely given the availability of constant psychiatric attention from BOP medical personnel:

> I cannot think of a case where the individual was competent when they left on their medication, stayed on their medication, and became not competent within the time frame of the judicial hearing 'cause these occur within--you know, sometimes, you know, after they're competent their judicial part may occur within six months. It may be longer in certain trials but I'm not aware of one that I have looked at where an individual who stayed on--

> THE COURT: Here we have a death penalty case where it can go on for years.

> [Dr. Sarrazin]: Right. And could there be an exacerbation of his illness [in] the middle of his trial, in spite of the fact that he's compliant on his medication? That would be a possibility.

> But I cannot think of a case where as long as they're getting their medication and MCC and MDC both have a psychiatrist that goes between the two. So, there would be psychiatric care available also.

(Id. at 108-09.)

In addressing Hardy's treatment plan and the possible side effects of long-acting haloperidol injections, Dr. Sarrazin noted:

> the dry mouth, the dry eyes . . . stiffness--we have medications such as Cogentin . . . or Artane or Benadryl. Any of those medications can be given

12

as a side effect medication. It helps with individuals so they don't have the stiffness that can sometimes happen. . . .

Tardive dyskinesia is a involuntary movement of the tongue and mouth. It can occur with other parts of the body. It is usually with high dosages of antipsychotics, first generations, over a long period of time; and it can be permanent.

So we monitor very closely. . . .

A rare, extremely rare possible complication of any of the antipsychotics, but particularly first generation antipsychotics, is called Neuroleptic Malignant Syndrome. That is where the body loses its ability to regulate its temperature. . . . Individuals often require ICU monitoring and treatment, and in rare cases it can be fatal. As I say, it's a rare illness that we do monitor for.

(Aug. 2009 Tr. 53-55.) Dr. Sarrazin stated that if Hardy refused to take medication to alleviate the side effects, other injectable medications were available that could be used as alternatives. (See id. at 87-89.) He also testified that any side effects would not likely "interfere significantly with [Hardy's] ability to assist his attorney in preparing his defense." (Id. at 58.)

At the hearing in November 2009, Dr. Dudley reiterated the view stated in his August and September opinion letters that there was not a substantial likelihood that antipsychotic medications could render Hardy competent to stand trial. (See Hearing Transcript, November 24, 2009 ("November 2009 Tr.") at 121.) While acknowledging that "[p]sychopharmacologic intervention[] with anti-psychotic medications" was the "treatment of choice for someone with Mr. Hardy's condition" (November 2009 Tr. 122; see also id. at 142), Dr. Dudley stated that Hardy's prognostic factors indicated that that treatment would likely not be effective (see id. at 123-29). Moreover, because he viewed Hardy as being in "the more pessimistic group," Dr. Dudley believed that a "more rigorous intervention" would be needed (id. at 135), creating a higher-than-normal risk

13

of side effects (see id. at 135-39)--although he could not express a view as to whether side effects of such medications would interfere with Hardy's ability to assist counsel (see id. at 140).

Following the close of the 2009 hearing, the parties submitted numerous memoranda, and the government asked the court to order involuntary medication.

C. Hearings in 2011 and 2012

In early 2011, Judge Trager passed away, and the case was reassigned to Judge Block. Thereafter, Judge Block, in light of the delays resulting from, inter alia, reassignment of the case, ordered reassessments of Hardy by Drs. Sarrazin and Preston-Baecht for the purpose of updating the views they had presented at the 2009 hearing. See Order dated September 29, 2011 ("September 2011 Order"). The court also ordered an update of the BOP January 2009 Report with regard to whether involuntary medication was recommended. The September 2011 Order stated that Hardy was not to be subjected to involuntary medication without further order of the court.

Hardy had been transferred from Springfield to the Metropolitan Detention Center ("MDC") in Brooklyn shortly after the conclusion of the Springfield evaluations in February 2009. After attempts in 2011 to conduct the required reassessments at MDC failed, Hardy was retransferred to Springfield. Before those examinations could be completed, Hardy attempted to assault a Springfield staff member, leading Springfield medical personnel, apparently unaware of the district court's September 2011 Order, to subject him to involuntary medication with haloperidol on an emergency basis.

14

1. The 2011 Administrative Hearing

At Springfield, a new administrative hearing was held in November 2011, eventually resulting in an Amended Involuntary Medication Report issued on December 6, 2011 ("BOP 2011 Report"). BOP psychiatrist Dr. Tomelleri again presided, and he had before him, inter alia, a file of disciplinary incidents involving Hardy at the various facilities in which he had been detained (see Part I.C.2. below).

Hardy appeared at the hearing, accompanied by a staff representative assigned to assist him. No other witnesses appeared, although Hardy's defense attorneys submitted a letter dated November 23, 2011 ("Celedonio & Ruhnke Letter"), stating that while Hardy "has been a discipline issue," "his offenses have all been of a relatively minor nature and have never yielded a serious injury," and "[i]t is implausible to suggest that he presents such a serious threat to others while confined to his cell that he requires medication." (Celedonio & Ruhnke Letter at 2.) The letter also stated that

> [i]t seems quite apparent to us that Mr. Hardy's inappropriate behavior can be managed with correctional measures . . . . We make no secret of our concern and suspicion that claiming the need to medicate Mr. Hardy . . . when no other BOP facility over a seven-year period has ever suggested medication as an alternative . . . is simply a convenient end run on the Supreme Court's requirements as set forth in Sell v. United States.

(Id.)

At the administrative hearing, Hardy "denied" that there were "any criminal charges against him"; "denied any misconduct" when asked about the "facts leading to past incident reports"; and

> insistently stated that Judge Trager from the Supreme Court ordered his release in 2009, so his present incarceration was invalid and his being kept in a locked

unit was illegal. He also proceeded to indicate that since his incarceration was invalid he could not be held responsible for any transgression or criminal act occurring during that period of time.

(BOP 2011 Report at 6 (emphasis added).) After the hearing, Dr. Tomelleri, citing Hardy's "total lack of insight, grandiose delusions, the belief that he is not responsible for any misconduct because he is invalidly incarcerated, and his aggressive acts," concluded that involuntary medication was needed because Hardy posed a danger to others, and that such medication was in Hardy's best medical interest. (Id.) In finding that Hardy was dangerous to others, Dr. Tomelleri relied principally on incidents in which Hardy had, inter alia, attempted to bite a BOP officer, or had threatened to break an officer's neck, or had attempted to stab a staff member with a sharpened object. (See id. at 5.) In finding that medication would be in Hardy's medical interest, Dr. Tomelleri stated that "[p]sychotropic medication is universally accepted as [the] treatment of choice for schizophrenia," and "[o]ther modalities of treatment such as psychotherapy do not address the fundamental problem." (Id. at 6.)

Dr. Tomelleri's decision was administratively appealed and affirmed. Because of the district court's September 2011 Order, however, Hardy has not been medicated since the November 8, 2011 emergency-medication incident.

2. Hardy's Disciplinary Incidents

Dr. Sarrazin had noted in the BOP February 2, 2009 Report that Hardy, upon his arrival at Springfield in 2008, had been placed in a Special Housing Unit ("SHU") not only because of "his disorganized mental status," but also because of his "history of agitation and aggression, such as stabbing another inmate at Metropolitan Correction Center [MCC] in New York, New York." (BOP

16

February 2, 2009 Report at 2.)  Hardy's disciplinary record by mid-January 2012 also included the following incident reports, the facts of which are apparently not in dispute:

> **June 23, 2005**: "As staff were placing a second inmate into [a] cell[,] inmate Hardy slipped his cuffs from behind him to in front of him.  Staff escorted . . . Hardy . . . out of [the] cell . . . .   As staff were escorting him to the holding cell area inmate Hardy swung at the escorting officer with a closed fist and struck him in the chin area.  Staff then placed inmate Hardy on the ground to gain control."  The officer "was . . . examined with minor tenderness with redness to the chin area" and "was treated with minor first aid." (Emphases added; capitalization omitted.)

> **November 3, 2006**: "Hardy . . . refused to move for the twenty-one day cell rotation and was then observed arming himself, by inserting numerous batteries inside a sock.  Inmate Hardy then barricaded his cell.  Confrontation avoidance was ineffective.  The warden authorized the use of chemical agents and a use of force team. . . . Upon entry, inmate Hardy struck a team member in the face shield with the batteries inside the sock." (Emphases added; capitalization omitted.)

> **February 25, 2008**: Hardy "assaulted inmate Broussard . . . with a 9[-inch] hard plastic comb sharpened to a point at one end.  As Broussard walked past [Hardy] on a tier, [Hardy] attacked him from behind, stabbing him once in the back of the head and once in the right side of his neck.  Responding staff recovered the weapon from a concealed location in [Hardy's] left shirt sleeve during a pat search . . . ." (Emphases added; capitalization omitted.)

> **June 8, 2010**: "Inmate Hardy . . . refused to have his hand restraints removed after he was placed in the recreation cell.  Inmate Hardy manipulated his restraints to the front of his body, refusing to relinquish the hand restraints.  A Use of Force Team was assembled . . . . Confrontational avoidance was attempted, proved ineffective and the Use of Force Team was ordered into the recreation cell.  Ambulatory restraints were applied, a medical assessment was conducted and inmate Hardy was escorted to his cell.  While inmate Hardy was being placed in his cell he attempted to pull away from staff.  Staff maintained control of inmate Hardy." (Emphases added.)

> **September 14, 2010**: "Inmate Hardy . . . threw a liquid substance hitting [an officer] on the upper torso and face."  The liquid had "the strong smell of urine," and the officer "had to be assessed by the medical department . . . to insure he had not been effected [sic] by this exposure." (Emphasis added.)

17

**October 15, 2010**: After Hardy refused to submit to hand restraints, and a use-of-force team summoned to restrain him attempted to spray Oleoresin Capsicum ("OC") into his cell, an officer reported: "I observed inmate Hardy . . . assault a Use of Force Team member b[y] striking him in the right hand with a sharpen[ed] item, as the officer attempted to use OC spray . . . . Specifically, inmate Hardy had a sharpen[ed] item in his hand and with a swinging motion, he injured the staff member on his right hand," causing a minor laceration. After officers entered the cell, and before Hardy was disarmed, an officer "observed inmate Hardy . . . attempt to assault a Use of Force Team member b[y] aggressively striking him in the torso area with a sharpen[ed] item . . . . Specifically, inmate Hardy had a sharpen[ed] item in his hand and with a jabbing motion attempted to inflict serious harm to a staff member. The Use of Force Team was able to disarm and subdue the inmate without further incident." (Emphases added.)

**October 16, 2010**: "I assisted Lt. Blesdoe and S.O. Elias with taking vital signs on Inmate Hardy . . . . Inmate Hardy became disruptive; combative by pulling away violently and refusing orders. Inmate Hardy tried to bite this officer in the process of . . . taking vital signs. I restrained Inmate Hardy's left arm to prevent him from moving violently." (Emphasis added.)

**November 15, 2010**: "[W]hile collecting breakfast trays . . . Hardy . . . stated he had trash for pick-up[. A]fter I opened his food slot inmate Hardy threw an unknown liquid substance from a milk container hitting me on my jacket and pants area." (Emphasis added.)

**November 22, 2010**: "[W]hile attempting to place Hardy . . . in hand restraints to place the inmate on the recreation deck, Inmate Hardy threw an unknown liquid from a milk carton which resulted in liquid hitting me in the facial and chest area."

(Emphasis added.)

**December 8, 2010**: "Hardy . . . threw an unknown liquid substance hitting me in the facial area which caused intense burning to my eyes." The officer was escorted to the hospital where he received eye drops and antibiotics as a precautionary measure for infection. (Emphases added.)

**January 21, 2011**: "Hardy . . . pressed the duress button. Upon responding, . . . Hardy stated 'yo I need a toothbrush.' I responded that evening watch gave supplies two days prior [and] no toothbrushes were available. He stated 'well find me one or else.' When I asked what do you mean by or else he threatened by saying 'I'll throw shit in your face like last time fagot.'" (Emphasis added.)

18

**January 13, 2012**: "I . . . proceeded to do a routine shakedown of inmate Hardy's cell . . . . The contraband that was discovered was 1 institution toothpaste tube that was devoid of toothpaste and refilled with what appeared to be urine and feces."

(Emphasis added.)

3. The District Court's 2012 Hearing

Judge Block held a two-day evidentiary hearing in January 2012, at which the incident reports of Hardy's misconduct were introduced, and at which some of the involved BOP officers testified. (See, e.g., Hearing Transcript, January 26, 2012 ("Jan. 26, 2012 Tr.") at 13-20 and Hearing Transcript, January 27, 2012 ("Jan. 27, 2012 Tr."), at 238-42 (Officers Henderson and Santiago, respectively, describing the events of October 15, 2010, when Hardy cut the hand of one officer with a shank and then attempted to stab Santiago with the shank, striking Santiago's protective vest barely four inches away from an unprotected area); Jan. 26, 2012 Tr. 31-34 (Officer Kosakowski describing the events of October 16, 2010, when Hardy attempted to bite him); Jan. 27, 2012 Tr. 220-23 (Officer Ferreira describing the June 23, 2005 incident in which Hardy, whose hands had been cuffed behind his body, maneuvered them to the front of his body and struck Ferreira in the face); id. at 231-34 and Jan. 26, 2012 Tr. 9-11 (Officers Lorenzo and Jamaica, respectively, describing the September 14, 2010 and December 8, 2010 incidents in which Hardy threw irritating liquids in their faces, placing them at risk of infection or disease); Jan 27, 2012 Tr. 246-50 (Officer Drake describing the November 3, 2006 incident in which Hardy attempted to strike a force team member with a sock filled with batteries); id. at 254-56 (Officer Rodriguez describing the February 25, 2008 incident in which Hardy stabbed another inmate in the head, neck, and arm with a sharpened comb).)

At the January 2012 hearing, the district court also heard testimony from Drs. Sarrazin and Preston-Baecht, who, inter alia, reaffirmed their prior views as to the efficacy of antipsychotic medication to restore Hardy to competency. (See, e.g., Jan. 26, 2012 Tr. 52, 115-16, 124-28, 137-38, 146.) Dr. Sarrazin added that "the gold standard treatment for psychotic illnesses such as schizophrenia is the anti-psychotic medications," and that without such medication, he saw no possibility of restoring Hardy's competency. (Id. at 52-53.) He testified that although Hardy had some disorganized thought processes, they did not amount to "disorganized schizophrenia" which is associated with more severe communication issues and is more difficult than paranoid schizophrenia to treat. (Id. at 92-93, 60.) Dr. Sarrazin also noted that Hardy did not appear to have a cognitive disorder (or a history of head injury, mental retardation, dementia, or other structural difficulty with the brain), the absence of which enables a more optimistic prognosis. (See id. at 59-60.) As a result, Dr. Sarrazin remained of the view that Hardy had a "better than 75 percent" chance of having his competency restored through the use of antipsychotic medication. (Id. at 60-61; see also id. at 56.)

Dr. Sarrazin also noted that the haloperidol administered to Hardy in the emergency caused by his uncontrolled conduct on November 7, 2011, had not appeared to cause him any side effects. "No untoward effects were noted, no abnormal physical findings were noted, abnormal movements," and Hardy "appeared to tolerate that medication without difficulty." (Jan. 26, 2012 Tr. 74-75.) Dr. Sarrazin also pointed out that he did not view the imposition of four-point restraints on Hardy as an acceptable alternative because it would "not . . . treat the illness." (Id. at 82.)

Both Drs. Sarrazin and Preston-Baecht opined that involuntary medication was preferable to cuffing Hardy's hands and feet--both for the health of the detainee and for the safety of others. Dr. Sarrazin testified that "if someone is in restraints for a long period of time, there's a

concern of deep vein thrombosis. They could get a clot in their leg. They have problems with moving their bowels because they're not moving their arms and legs. There could be times when they may be develop abrasions on their arms or their legs." (Id. at 79.) Dr. Preston-Baecht agreed:

> Being in that position for a long period of time, obviously, you risk physical problems such as blood clots, other things of that nature . . . .
>
> Additionally, it actually requires staff to have more physical contact with him because they have to give him food trays, they have to monitor his vitals every few hours, they have to somehow assist him from toileting-- whether or not they hand him a urinal or they change a diaper, it involves a lot more contact between the staff and an inmate--they can still spit on staff, they can still try to bite staff. So, not only is it, I think, inherently risky to the patient, it's also risky to the staff.

(Jan. 26, 2012 Tr. 143.)

Dr. Preston-Baecht also testified that Hardy's potential for violence, posing a high "risk to staff," is linked to Hardy's "most problematic symptom, psychotic symptom," which is his "delusional belief that because he's being held--in his mind--illegally, he cannot be held responsible for any aggressive or violent behavior that he engages in." (Id. at 142-43.)

Dr. Preston-Baecht was questioned on her assessment of Hardy as "high-risk," given that she had filed periodic SHU reports in which she had indicated that his threat to others was "moderate." (Id. at 144-45.) She testified that "moderate" was not an accurate assessment of her opinion of the risk that Hardy posed to others, but that because of a technological oversight, she had copied "moderate" from other reports rather than indicating more accurately that Hardy was a high-risk threat. (Id.)

Hardy submitted to the court an affidavit by psychologist Dr. Xavier Amador, whose opinion was consistent with the views submitted on Hardy's behalf in 2009 by Dr. Dudley. (See

21

Affidavit of Dr. Xavier Amador dated June 14, 2011.) Dr. Amador agreed that Hardy could not be restored to competency without treatment with antipsychotic medication; but his view was that, in light of Hardy's specific prognostic factors, such as the several years' duration of his untreated delusions and his family history of schizophrenia, Hardy was "highly unlikely to respond." (Id. at 9-10, 14.) Dr. Amador also criticized the studies on which Dr. Sarrazin relied, contending that they had been poorly executed and were thus invalid or irrelevant to Hardy given his individual prognostic factors. (See id. at 10-14.) Dr. Amador concluded that "there is presently no evidence that could support a finding that there is a substantial likelihood that Mr. Hardy could be restored to competency within the foreseeable future." (Id. at 15-16.)

Dr. Amador testified at the 2012 hearing and reiterated those views. (See Jan. 26, 2012 Tr. 166, 169-70.) He also acknowledged, however, that antipsychotic medication is the treatment of choice--the first-line of treatment when dealing with a schizophrenic patient--and stated that even where the chance that a patient will respond is low, "[i]n every case I want to give the person a chance." (Id. at 176.) And he acknowledged on cross-examination that for the majority of patients, "[t]he most important prognostic indicator" of whether they will be responsive to medication "is whether or not they adhere fully to their prescribed medication regimen," and for that reason, long-acting injectables, rather than oral medications were preferable. (Id. at 185-86.) Nonetheless, Dr. Amador opined that "[a]t absolute best I g[i]ve a 35 percent chance that you could improve the delusions that are impairing [Hardy's] competency." (Id. at 166; see id. at 212.)

D.  The Decision of the District Court

In a July 19, 2012 Memorandum and Order reported at 878 F.Supp.2d 373, the district court concluded that involuntary medication of Hardy was warranted under either the Harper dangerousness test or the Sell restoration-to-competency test.

1.  Dangerousness

With respect to the Harper dangerousness test, the court mentioned several of the above incidents--principally those that occurred on October 15, 2010 (Hardy cutting the hand of one officer and attempting to stab the torso of another), October 16, 2010 (Hardy attempting to bite an officer), December 8, 2010 (Hardy throwing irritating liquid into an officer's eyes), see 878 F.Supp.2d at 379, and January 13, 2012 (Hardy's possession of the toothpaste tube refilled with urine and feces), see id. at 379-80.  The court concluded that Hardy posed a danger to others, reasoning as follows:

> The incidents described at the January 2012 hearing are not themselves in dispute.  Defense counsel argues, however, that, given the circumstances, they do not support a finding that Hardy presents a continuing danger to others. The Court disagrees. The facts described at the hearing unequivocally show that Hardy's outbursts are not isolated incidents, but a pattern of violent behavior.
>
> The common-sense of the opinions of Drs. Sarrazin and Preston-Baecht that Hardy's psychosis is at the root of his violent behavior is too powerful to dismiss.  From Hardy's perspective, he is essentially a hostage or kidnapping victim. . . . That Hardy has not, as far as the record reflects, had any incident reports since January [2012] does not assuage the Court's concern that addition[al] aggressive behavior is possible--even likely--as long as the reason for it exists.
>
> The Court has considered whether the BOP's interest in protecting the safety of its staff can be achieved through measures that do not impinge on Hardy's interest in refusing medication.  But no such measures are apparent.

23

As the Supreme Court noted in Harper, "[p]hysical restraints are effective only in the short term, and can have serious physical side effects when used on a resisting inmate . . . , as well as leaving the staff at risk of injury while putting the restraints on or tending to the inmate who is in them." 494 U.S. at 226-27 . . . . Physical isolation has also proven ineffective, inasmuch as some of the incidents described . . . occurred while Hardy was confined to the SHU.

878 F.Supp.2d at 383 (emphases added).

The district court also concluded that treatment with antipsychotic medication was in Hardy's medical interest, as

[i]t is undisputed that such medication is the treatment of choice for Hardy's condition. . . . Without it, no treatment can demonstrate the fallacy of the patient's delusion. With medication, by contrast, there is at least the hope that Hardy can be made aware that he is being lawfully detained pending trial. While that awareness may not be pleasant, it might at least allow Hardy to cope in less antisocial ways.

Id. In considering possible side effects, the district court credited, "without qualification, Dr. Sarrazin's testimony that the most likely side effects are easily treatable, and that the less likely side effects can be avoided through a combination of careful monitoring, dosage adjustment and--as a last resort--discontinuation of the medication." Id. at 384.

The court concluded:

Defense counsel have raised the sensible concern that declaring an inmate to be a danger to himself or others is a tempting end run around the more stringent standard of Sell . . . . But the evidence of Hardy's dangerousness is too concrete and persuasive to allow for the possibility that the BOP is manufacturing a reason to medicate Hardy. The Court is convinced that Hardy poses a danger to corrections staff, that that danger cannot reasonably be abated without antipsychotic medication, and that such medication is in Hardy's medical interest.

Id.

24

## 2. Restoration to Competence Sufficient To Stand Trial

The district court noted that its "findings that Hardy poses a danger to others and that antipsychotic medication is in his medical interest" made it "unnecessary to decide" under Sell whether Hardy "can be medicated to restore his competency to stand trial." 878 F.Supp.2d at 384. Nonetheless, the court addressed the Sell issues in the interest of judicial efficiency.

The district court identified four prerequisites for an order of involuntary medication to restore a detainee's competence to stand trial: (1) the presence of an important government interest; (2) the likelihood that involuntary medication will significantly further that interest, which depends on whether the medication is substantially likely to render the defendant competent to stand trial; (3) the need for such treatment in order to further the government's interest, which relates to whether the defendant is likely to return to competency without such treatment; and (4) the medical appropriateness of such treatment. See id. at 382. The court noted that the first issue--a significant government interest--was not in dispute. Hardy's attorneys "concede[d] that the government has an important interest in bringing Hardy to trial," a concession fully warranted by the seriousness of "[t]he charges against Hardy and the penalty he faces." Id. at 384.

The court concluded that the second, third, and fourth prerequisites were also met, based on much of the evidence it had described in reaching its Harper dangerousness decision, see 878 F.Supp.2d at 384-86, including the view of Dr. Sarrazin that the involuntary medication of Hardy with antipsychotic medicine would have "a better than 75 percent chan[c]e of restoring Hardy to competence," id. at 385; the views of Drs. Sarrazin, Preston-Baecht, and Amador that there was no possibility that Hardy would regain competency without such medication, see id. at 386; and the

25

consensus of all the psychiatrists and psychologists who testified that "[a]ntipsychotic medication is . . . the . . . treatment of choice for Hardy's condition" and thus is "medically appropriate," id.

The court concluded:

> There is, of course, no guarantee that antipsychotic medication will render Hardy competent to stand trial. But in this area, as in many others, complete certainty is an unattainable goal. Thus, the government's burden, though high, is not impossible. In that regard, the evidence is clear and convincing that there is a substantial likelihood of restoring Hardy to competency without causing side effects that would prejudice his ability to assist in his defense and receive a fair trial.

Id.

### 3. The Involuntary Medication Order

The district court ordered as follows:

> The BOP is authorized to implement Dr. Tomelleri's decision to involuntarily medicate Hardy to reduce the danger he poses to staff. It is further authorized to involuntarily medicate Hardy in accordance with the treatment plan set out in Dr. Sarrazin's February 2009 report for the purpose of restoring Hardy's competency to stand trial. The Court's prior order prohibiting involuntary medication shall, however, remain in effect long enough to allow Hardy to file and expeditiously pursue an appeal.

878 F.Supp.2d at 386-87.

## II. DISCUSSION

On appeal, Hardy contends that the district court erred in its applications of both the Harper test and the Sell test. As to the former, he argues that he is not dangerous because "many" of

26

his actions "are not worthy of being categorized as acts of violence or aggression" (Hardy brief on appeal at 57) and/or because his conduct can be controlled by BOP staff and procedures. As to the latter, Hardy argues principally that the government failed to show that there was a substantial likelihood that, with the use of antipsychotic medication, his competency could be restored.

As the Supreme Court stated in Sell, "[a] court need not consider" whether involuntary medication is permissible for the purpose of restoring a defendant's competence to stand trial "if forced medication is warranted for a different purpose, such as the purposes set out in Harper related to the individual's dangerousness." 539 U.S. at 181-82 (emphasis in original). Accordingly, in the present case, without suggesting that the district court's application of the Sell standard was erroneous, we do not reach the Sell issues, and we affirm its order for the involuntary medication of Hardy under the standard set in Harper.

A. The Harper Standard

"The forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty." Harper, 494 U.S. at 229. Thus, a prisoner convicted of a crime "possesses a significant liberty interest," protected by the Due Process Clause, "in avoiding the unwanted administration of antipsychotic drugs." Id. at 221.

A detainee who has not been convicted of a crime has no lesser right. See, e.g., Riggins v. Nevada, 504 U.S. 127, 135 (1992) ("'[P]retrial detainees, who have not been convicted of any crimes, retain at least those constitutional rights that we have held are enjoyed by convicted prisoners.'" (quoting Bell v. Wolfish, 441 U.S. 520, 545 (1979))).

27

The right of a prisoner or a detainee to avoid involuntary medication, however, may be outweighed by competing governmental interests, see, e.g., Harper, 494 U.S. at 223-25, such as the interest of prison administrators "in ensuring the safety of prison staffs and administrative personnel," id. at 225. "Where an inmate's mental disability is the root cause of the threat he poses to the inmate population, the [government's] interest in decreasing the danger to others necessarily encompasses an interest in providing him with medical treatment for his illness." Id. at 225-26. There is a "legitimate governmental interest in" the involuntary medication of an inmate "where medically appropriate for the purpose of reducing the danger he poses." Id. at 226 (emphasis added).

As to whether such treatment is "medically appropriate," Harper suggests, while "acknowledg[ing] the fallibility of medical and psychiatric diagnosis," id. at 232 (internal quotation marks omitted), that appropriate "deference . . . is owed to medical professionals who have the full-time responsibility of caring for mentally ill inmates . . . and who possess, as courts do not, the requisite knowledge and expertise to determine whether the drugs should be used in an individual case," id. at 230-31 n.12. Indeed, the Harper Court held that the Washington Supreme Court had erred in ruling that involuntary medication under the above standard could not be administered without the approval of a court. See id. at 231 ("Notwithstanding the risks that are involved, we conclude that an inmate's interests are adequately protected, and perhaps better served, by allowing the decision to medicate to be made by medical professionals rather than a judge."). In Harper, there had been no challenge to the trial court's finding that "the medical care provided to respondent was appropriate under medical standards." Id. at 231 n.12. Where, as here, a dispute among doctors as to whether the proposed medicine should be administered is brought to the court, "the nonspecialist decisionmaker" will have to "make a medical-psychiatric decision," id. at 232 (internal quotation marks omitted).

28

Although the Harper Court recognized the "considerable debate over the potential side effects of antipsychotic medications," it also noted that "there is little dispute in the psychiatric profession that proper use of the drugs is one of the most effective means of treating and controlling a mental illness likely to cause violent behavior." 494 U.S. at 226. The Court noted that seclusion and the use of physical restraints are not "alternative[s] that fully accomodat[e] the prisoner's rights at de minimis cost to valid penological interests"; those methods "are effective only in the short term, and can have serious physical side effects when used on a resisting inmate . . . as well as leaving the staff at risk of injury while putting the restraints on or tending to the inmate who is in them." Id. at 226-27 (internal quotation marks omitted).

The Harper Court concluded that

> given the requirements of the prison environment, the Due Process Clause
> permits the [government] to treat a prison inmate who has a serious mental
> illness with antipsychotic drugs against his will, if the inmate is dangerous to
> himself or others and the treatment is in the inmate's medical interest.

Id. at 227.

B.  The Present Case

In reviewing a district court's decision to approve the involuntary medication of a detainee, we review its conclusions of law, such as the standards applied, de novo; we review the court's findings of fact, such as the detainee's medical condition and the history of his conduct, for clear error. See generally United States v. Gomez, 387 F.3d 157, 160 (2d Cir. 2004). Where the district court has made no error of law nor any clearly erroneous finding of fact, and has treated views of the medical personnel with appropriate deference, we will uphold the court's ultimate decision on

29

whether to authorize involuntary medication on the ground of dangerousness and medical necessity, so long as its decision is located within the range of permissible decisions.

In the present case, we see no basis for disturbing the district court's order authorizing involuntary medication of Hardy. The court properly set out the standard established by Harper, that there must be a showing that the inmate has a serious mental illness, that he poses a danger to himself or others, and that the proposed treatment is in the inmate's medical interest. From mid-2008 onward, the psychiatrists and psychologists agreed that Hardy suffered from schizophrenia. Before reaching its decision in 2012, the court assured that the relevant data on Hardy's mental illness were as current and accurate as possible by ordering reassessments of his condition and holding a new evidentiary hearing at which the psychiatrists and psychologists could testify and be closely questioned. The court's finding that Hardy's past conduct indicates that he poses a danger to others is amply supported by Hardy's record of disciplinary incidents, described in Part I.C.2. above, which include Hardy's threats of harm, his attempts to bite or hit officers, his repeated throwing of liquids in their faces, and his attempted and actual stabbings.

The district court properly recognized the consensus of the testifying psychiatrists and psychologists that antipsychotic medication is the treatment of choice for someone with Hardy's condition. And it accorded appropriate deference to the views of the BOP psychiatrists and psychologists charged with observing and treating him, that Hardy's attempts to harm prison personnel resulted principally from his delusions that he is in custody without reason, that the administration of antipsychotic drugs has a substantial chance of eliminating those delusions, and that without such treatment there is little or no chance that Hardy's condition would improve.

30

We see in the district court's decision no error of law or fact, and its order for the involuntary medication of Hardy under the Harper standard is well within the range of permissible decisions.

CONCLUSION

We have considered all of Hardy's challenges to the district court's application of Harper and, for the reasons stated above, have found them to be without merit. The order of the district court is affirmed. The mandate shall issue forthwith.